YOUR NAME Denise and Ken Cook
YOUR ADDRESS (very important) 300 Newt Gulch Rd, Wilderville, OR 97543
YOUR TELEPHONE NUMBER (very important) 541-761-0165

FILED'10 NOV 4 15:02 USDC-ORM

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

*YOUR NAME*, Denise and Kenneth Cook )
                                       )
                   Plaintiff,          )    Case Number 1:10CV3121-PA
                                       )
        v.                             )
                                       )    ~~COMPLAINT~~
*DEFENDANT(S) NAME(S)*,                )    Prelimanary Injuction
Beneficial, HSBC MORT. Corp            )
                   Defendant(s).       )

(Body of your complaint)

DATED this __4th__ day of __NOV__ (Month) _____, 200 0 .

_Denise Cook   Kenneth Cook_
YOUR SIGNATURE (very important)

**(Exhibit 3)**

*10 - 3121 - PA*

1   Preliminary Injunction                                    FILED 10 NOV 4 1431 USDC-ORM

2                                              Date: Nov 3rd 2010

3   Comes now Denise & Kenneth  Cook , hereinafter referred to as "Petitioner," and moves the

4   court for relief as herein requested:

5                                              **PARTIES**

6   Petitioner is Denise & Kenneth  Cook ,  300 Newt Gulch Road   Wilderville   OR  97543.

7   Currently Known Defendant(s) are/is:     Beneficial , HSBC Mort. Corp. 2929 Walden Ave,

8   Depew NY 14043

9                                         **STATEMENT OF CAUSE**

10  Petitioner, entered into a consumer contract for the refinance of a primary residence located at

11  300 Newt Gulch Road  , hereinafter referred to as the "property."

12  Defendants, acting in concert and collusion with others, induced Petitioner to enter into a

13  predatory loan agreement with Defendant.

14  Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully

15  crafted scheme intended to defraud Petitioner.

16  Defendants failed to make proper notices to Petitioner that would have given Petitioner warning

17  of the types of tactics used by Defendants to defraud Petitioner.

18  Defendants charged false fees to Petitioner at settlement.

19  Defendants used the above referenced false fees to compensate agents of Petitioner in order to

20  induce said agents to breach their fiduciary duty to Petitioner.

21  Defendant's attorney caused to be initiated collection procedures, knowing said collection

22  procedures in the instant action were frivolous as lender is estopped from collection procedures,

23  under authority of  Uniform Commercial Code 3-501, subsequent to the request by Petitioner for

24  the production of the original promissory note alleged to create a debt.

25                                              **IN BRIEF**

26                                 *(Non-factual Statement of Posture and Position)*

PRELIMINARY INJUNCTION             1 of 26

27    It is not the intent of Petitioner to indict the entire industry.  It is just that Plaintiff will be

28    making a number of allegations that, outside the context of the current condition of the real

29    estate industry, may seem somewhat outrageous and counter-intuitive.

30    When Petitioner accuses ordinary individuals of acting in concert and collusion with an

31    ongoing criminal conspiracy, it tends to trigger an incredulous response as it is

32    unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary

33    people, just doing what they have been trained to do, are out to swindle the poor

34    unsuspecting borrower.

35    The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud

36    committed by people acting in concert and collusion, one with the other.  Petitioner has no

37    reason to believe that the Agent, loan officer, appraiser, and others were consciously aware

38    that what they were doing was part of an ongoing criminal conspiracy, only that it was,

39    and they, at the very least, kept themselves negligently uninformed of the wrongs they

40    were perpetrating.  Petitioner maintains the real culprit is the system itself, including the

41    courts, for failure to strictly enforce the consumer protection laws.

42                    **CAREFULLY CRAFTED CRIMINAL CONNIVANCE**

43                        *(General State of the Real Estate Industry)*

44    ***THE BEST OF INTENTIONS***

45    Prior to the 1980's and 1990's ample government protections were in place to protect

46    consumers and the lending industry from precisely the disaster we now experience.

47    During President Clinton's administration, under the guise of making housing available to

48    the poor, primary protections were relaxed which had the effect of releasing the

49    unscrupulous on the unwary.

50    Prior to deregulation in the 1980's, lenders created loans for which they held and assumed

51    the risk.  Consequently, Americans were engaged in safe and stable home mortgages.

52    With the protections removed, the unscrupulous lenders swooped in and, instead of

53    making loans available to the poor, used the opportunity to convince the unsophisticated

54    American public to do something that had been traditionally taboo; home buyers were

55    convinced to speculate with their homes, their most important investment.

56    Beneficial Oregon, Inc. , Ameriquest, Countrywide, and many others swooped in and

57    convinced Americans to sell their homes, get out of their safe mortgage agreements, and

PRELIMINARY INJUNCTION            2 of 26

58   speculate with the equity they had gained by purchasing homes they could not afford.
59   Lenders created loans intended to fail as, under the newly crafted system, the Lender
60   profited more from a mortgage default than from a stable loan.

61   Companies cropped up who called themselves banks when, in fact, they were only either
62   subsidiaries of banks, or unaffiliated companies that were operated for the purpose of
63   creating and selling promissory notes.  As will be demonstrated, these companies then
64   profited from the failure of the underlying loans.

65   ***HOW IT WORKS***

66   Briefly, how it works is this, the Lender would secure a large loan from a large bank,
67   convert that loan into 20 and 30 year mortgages and then sell the promise to pay to an
68   investor.

69   People would set up mortgage companies by securing a large loan from one of the major
70   banks, then convert that loan into 20 and 30 year mortgages.  In order to accomplish this
71   an Agent would contract with a seller to find a buyer, bring both seller and buyer to a
72   lender who would secure the title from the seller using the borrowed bank funds for that
73   purpose, and then trade the title to the buyer in exchange for a promissory note.

74   The lender then creates a 20 or 30 year mortgage with money the lender must repay within
75   6 months.  As soon as the closing is consummated, the promissory note is sold to an
76   investor pool.

77   Using the instant case as an example, a $210,720.35 note at 8.5500%%  interest over 30
78   years will produce $272,413.31    The lender can then offer to the investor the security
79   instrument (promissory note) at say 50% of it's future value.  The investor will, over the
80   life of the note, less approximately 3.00% servicing fees, realize $289,806.63 .  The lender
81   can then pay back the bank and retain a handsome profit in the amount of $97,012.47.  The
82   lender, however, is not done with the deal.

83   The lender signed over the promissory note to the investor at the time of the trade, but did
84   not sign over the lien document (mortgage or deed of trust).  The State of Kansas Supreme
85   Court addressed this issue and stated that such a transaction was certainly legal.  However,
86   it created a fatal flaw as the holder of the lien document, at time of sale of the security
87   instrument, received consideration in excess of the lien amount.  Since the lien holder

PRELIMINARY INJUNCTION          3 of 26

88  received consideration, he could not be harmed.    Therefore the lien became an
89  unenforceable document.

90  This begs the question: if keeping the lien would render it void, why would the lender not
91  simply transfer the lien with the promissory note?  The reason is because the lender will
92  hold the lien for three years, file an Internal Revenue Service Form 1099a, claim the full
93  amount of the lien as abandoned funds, and deduct the full amount from the lender's tax
94  liability.  The lender, by this maneuver, gets consideration a second time.  And still the
95  lender is not done profiting from the deal.

96  After sale of the promissory note, the lender remains as the servicer for the investor.  The
97  lender will receive 3% of each payment the lender collects and renders to the investor
98  pool.  However, if the payment is late, the lender is allowed to assess an extra 5% and keep
99  that amount.  Also, if the loan defaults, the lender stands to gain thousands for handling the
100 foreclosure.

101 The lender stands to profit more from a note that is overly expensive, than from a good
102 stable loan.  And where, you may ask, does all this profit come from?  It comes from the
103 equity the borrower had built up in the home.  And still the lender is not finished profiting
104 from the deal.

105 Another nail was driven in the American financial coffin when on the last day Congress
106 was in session in 2000 when restrictions that had been in place since the economic
107 collapse of 1907 were removed.  Until 1907  investors were allowed to bet on stocks
108 without actually buying them.  This unbridled speculation led directly to an economic
109 collapse.  As a result the legislature banned the practice, until the year 2000.  In 2000 the
110 unscrupulous lenders got their way on the last day of the congressional session.  Congress
111 removed the restriction banning derivatives and again allowed the practice, this time
112 taking only 8 years to crash the stock market.   This practice allowed the lender to profit
113 further from the loan by betting on the failure of the security instrument he had just sold to
114 the unwary investor, thus furthering the purpose of the lender to profit from both the
115 borrower (consumer) and the investor.

116 The failure of so many loans recently resulted in a seven hundred and fifty billion dollar
117 bailout at the expense of the taxpayer.   The unsuspecting consumer was lulled into
118 accepting the pronouncements of the lenders, appraisers, underwriters, and trustees as all
119 were acting under the guise of government regulation and, therefore, the borrower had

120 reason to expect good and fair dealings from all. Unfortunately, the regulations in place to
121 protect the consumer from just this kind of abuse were simply being ignored.

122 The loan origination fee from the HUD1 settlement statement is the finder's fee paid for
123 the referral of the client to the lender by a person acting as an agent for the borrower.
124 Hereinafter, the person or entity who receives any portion of the yield spread premium, or
125 a commission of any kind consequent to securing the loan agreement through from the
126 borrower will be referred to as "Agent." The fee, authorized by the consumer protection
127 law is restricted to 1% of the principal of the note. It was intended that the Agent, when
128 seeking out a lender for the borrower, would seek the best deal for his client rather than
129 who would pay him the most. That was the intent, but not the reality. The reality is that
130 Agents never come away from the table with less than 2% or 3% of the principal. This is
131 accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his
132 fiduciary duty to the borrower and convince the borrower to accept a more expensive loan
133 product than the borrower qualifies for. This will generate more profits for the lender and,
134 consequently, for the Agent.

135 It is a common practice for lenders to coerce appraisers to give a higher appraisal than is
136 the fair market price. This allows the lender to increase the cost of the loan product and
137 give the impression that the borrower is justified in making the purchase.

138 The lender then charges the borrower an underwriting fee in order to convince the
139 borrower that someone with knowledge has gone over the conditions of the note and
140 certified that they meet all legal criteria. The trustee, at closing, participates actively in the
141 deception of the borrower by placing undue stress on the borrower to sign the large stack
142 of paperwork without reading it. The trustee is, after all, to be trusted and has been paid to
143 insure the transaction. This trust is systematically violated for the purpose of taking unfair
144 advantage of the borrower. The entire loan process is a carefully crafted contrive
145 connivance designed and intended to induce the unsophisticated borrower into accepting a
146 loan product that is beyond the borrowers means to repay. With all this, it should be a
147 surprise to no one that this country is having a real estate crisis.

148 ## PETITIONER WILL PROVE THE FOLLOWING
149 Petitioner is prepared to prove, by a preponderance of evidence that:

150 • Lender has no legal standing to bring collection or foreclosure claims against the
151   property;

PRELIMINARY INJUNCTION          5 of 26

152   • Lender is not a real party in interest in any contract which can claim a collateral
153     interest in the property;

154   • even if Lender were to prove up a contract to which Lender had standing to enforce
155     against Petitioner, no valid lien exists which would give Lender a claim against the
156     property;

157   • even if Lender were to prove up a contract to which Lender had standing to enforce
158     against Petitioner, said contract was fraudulent in its creation as endorsement was
159     secured by acts of negligence, common law fraud, fraud by non-disclosure, fraud in
160     the inducement, fraud in the execution, usury, and breaches of contractual and
161     fiduciary obligations by Mortgagee or "Trustee" on the Deed of Trust, "Mortgage
162     Agents," "Loan Originators," "Loan Seller," "Mortgage Aggregator," "Trustee of
163     Pooled Assets," "Trustee or officers of Structured Investment Vehicle,"
164     "Investment Banker," "Trustee of Special Purpose Vehicle/Issuer of Certificates of
165     'Asset-Backed Certificates,'" "Seller of 'Asset-Backed' Certificates (shares or
166     bonds)," "Special Servicer" and Trustee, respectively, of certain mortgage loans
167     pooled together in a trust fund;

168   • Defendants have concocted a carefully crafted connivance wherein Lender
169     conspired with Agents, et al, to strip Petitioner of Petitioner's equity in the property
170     by inducing Plaintiff to enter into a predatory loan inflated loan product;

171   • Lender received unjust enrichment in the amount of 5% of each payment made late
172     to Lender while Lender and Lender's assigns acted as servicer of the note;

173   • Lender and Lender's assigns, who acted as servicer in place of Lender, profited by
174     handling the foreclosure process on a contract Lender designed to have a high
175     probability of default;

176   • Lender intended to defraud Investor by converting the promissory note into a
177     security instrument and selling same to Investor;

178   • Lender intended to defraud Investor and the taxpayers of the United States by
179     withholding the lien document from the sale of the promissory note in order that
180     Lender could then hold the lien for three years, then prepare and file Internal
181     Revenue Form 1099a and falsely claim the full lien amount as abandoned funds
182     and deduct same from Lender's income tax obligation;

183      •   Lender defrauded backers of derivatives by betting on the failure of the promissory
184           note the lender designed to default;

185      •   participant Defendants, et al, in the securitization scheme described herein have
186           devised business plans to reap millions of dollars in profits at the expense of
187           Petitioner and others similarly situated.

188                             **PETITIONER SEEKS REMEDY**

189 In addition to seeking compensatory, consequential and other damages, Petitioner seeks
190 declaratory relief as to what (if any) party, entity or individual or group thereof is the
191 owner of the promissory note executed at the time of the loan closing, and whether the
192 Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory
193 Injunction requiring re-conveyance of the subject property to the Petitioner or, in the
194 alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

195      ***PETITIONER HAS BEEN HARMED***

196 Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

197 Such harm and detriment includes economic and non-economic damages, and injuries to
198 Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

199 In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the
200 equitable relief requested herein is granted.

201                            **STATEMENT OF CLAIM**

202      ***DEFENDANTS  LACK STANDING***

203           **No evidence of Contractual Obligation**

204 Defendants claim a controversy based on a contractual violation by Petitioner but have failed to
205 produce said contract. Even if Defendants produced evidence of the existence of said contract in
206 the form of an allegedly accurate photocopy of said document, a copy is only hearsay evidence
207 that a contract actually existed at one point in time. A copy, considering the present state of
208 technology, could be easily altered. As Lender only created one original and that original was
209 left in the custody of Lender, it was imperative that Lender protect said instrument.

210  In as much as the Lender is required to present the original on demand of Petitioner, there can be
211  no presumption of regularity when the original is not so produced.    In as much as Lender has
212  refused Petitioner's request of the chain of custody of the security instrument in question by
213  refusing to identify all current and past real parties in interest, there is no way to follow said
214  chain of custody to insure, by verified testimony, that no alterations to the original provisions in
215  the contract have been made.    Therefore, the alleged copy of the original is only hearsay
216  evidence that an original document at one time existed.    Petitioner maintains that, absent
217  production of admissible evidence of a contractual obligation on the part of Petitioner,
218  Defendants are without standing to invoke the subject matter jurisdiction of the court.

219  **No Proper Evidence of Agency**

220  Defendants claim agency to represent the principal in a contractual agreement involving
221  Petitioner, however, Defendants have failed to provide any evidence of said agency other than a
222  pronouncement that agency has been assigned by some person, the true identity and capacity of
223  whom has not been established.   Defendants can hardly claim to be agents of a principal then
224  refuse to identify said principal.   All claims of agency are made from the mouth of the agent with
225  no attempt to provide admissible evidence from the principal.

226  Absent proof of agency, Defendants lack standing to invoke the subject matter jurisdiction of the
227  court.

228  **Special Purpose Vehicle**

229  Since the entity now claiming agency to represent the holder of the security instrument is not the
230  original lender, Petitioner has reason to believe that the promissory note, upon consummation of
231  the contract, was converted to a security and sold into a special purpose vehicle and now resides
232  in a Real Estate Mortgage Investment Conduit (REMIC)    as defined by the Internal Revenue
233  Code and as such, cannot be removed from the REMIC as such would be a prohibited
234  transaction.    If the mortgage was part of a special purpose vehicle and was removed on
235  consideration of foreclosure, the real party in interest would necessarily be the trustee of the
236  special purpose vehicle.   Nothing in the pleadings of Defendants indicates the existence of a
237  special purpose vehicle, and the lack of a proper chain of custody documentation gives Petitioner
238  cause to believe defendant is not the proper agent of the real party in interest.

PRELIMINARY INJUNCTION          8 of 26

239 ***CRIMINAL CONSPIRACY AND THEFT***

240 Defendants, by and through Defendant's Agents, conspired with other Defendants, et al, toward
241 a criminal conspiracy to defraud Petitioner. Said conspiracy but are not limited to acts of
242 negligence, breach of fiduciary duty, common law fraud, fraud by non-disclosure, and tortuous
243 acts of conspiracy and theft, to include but not limited to, the assessment of improper fees to
244 Petitioner by Lender, which were then used to fund the improper payment of commission fees to
245 Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

246 ***AGENT PRACTICED UP-SELLING***

247 By and through the above alleged conspiracy, Agent practiced up-selling to Petitioner. In so
248 doing, Agent violated the trust relationship actively cultivated by Agent and supported by fact
249 that Agent was licensed by the state. Agent further defrauded Petitioner by failing to disclose
250 Agent's conspiratorial relationship to Lender,  Agent violated Agent's fiduciary duty to
251 Petitioner and the duty to provide fair and honest services, through a series of carefully crafted
252 connivances, wherein Agent proactively made knowingly false and misleading statements of
253 alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead
254 Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of
255 a loan product offered by the Lender. Said loan product was more expensive than Petitioner
256 could legally afford. Agent acted with full knowledge that Petitioner would have made a
257 different decision had Agent given complete disclosure.

258 ***FRAUDULENT INDUCEMENT***

259 Lender maliciously induced Petitioner to accept a loan product, Lender knew, or should have
260 known, Petitioner could not afford in order to unjustly enrich Lender.

261 ***EXTRA PROFIT ON SALE OF PREDATORY LOAN PRODUCT***

262 Said more expensive loan product was calculated to produce a higher return when sold as a
263 security to an investor who was already waiting to purchase the loan as soon as it could be
264 consummated.

265 **Extra Commission for Late Payments**

266 Lender acted with deliberate malice in order to induce Petitioner to enter into a loan agreement
267 that Lender intended Petitioner would have difficulty paying. The industry standard payment to
268 the servicer for servicing a mortgage note is 3% of the amount collected. However, if the
269 borrower is late on payments, a 5% late fee is added and this fee is retained by the servicer.
270 Thereby, the Lender stands to receive more than double the regular commission on collections if
271 the borrower pays late.

272 **Extra Income for Handling Foreclosure**

273 Lender acted with deliberate malice in order to induce petitioner to enter into a loan agreement
274 on which Lender intended petitioner to default. In case of default, the Lender, acting as servicer,
275 receives considerable funds for handling and executing the foreclosure process.

276 **Credit Default Swap Gambling**

277 Lender, after deliberately creating a loan intended to default is now in a position to bet on credit
278 default swap, commonly referred to as a derivative as addressed more fully below. Since Lender
279 designed the loan to fail, betting on said failure is essentially a sure thing.

280 ***LENDER ATTEMPTING TO FRAUDULENTLY COLLECT ON VOID LIEN***

281 Lender sold the security instrument after closing and received consideration in an amount in
282 excess of the lien held by Lender. Since Lender retained the lien document upon the sale of the
283 security instrument, Lender separated the lien from said security instrument, creating a fatal and
284 irreparable flaw.

285 When Lender received consideration while still holding the lien and said consideration was in
286 excess of the amount of the lien, Lender was in a position such that he could not be harmed and
287 could not gain standing to enforce the lien. The lien was, thereby, rendered void.

288 Since the separation of the lien from the security instrument creates such a considerable concern,
289 said separation certainly begs a question: "Why would the Lender retain the lien when selling the
290 security instrument?"

291   When you follow the money the answer is clear.  The Lender will hold the lien for three years,
292   then file an IRS Form 1099a and claim the full amount of the lien as abandoned funds and deduct
293   the full amount from Lender's tax liability, thereby, receiving consideration a second time.

294   Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the
295   lien to the holder of the security, however, the lien once satisfied, does not gain authority just
296   because the holder, after receiving consideration, decides to transfer it to someone else.

297   ### *LENDER PROFIT BY CREDIT DEFAULT SWAP DERIVATIVES*

298   Lender further stood to profit by credit default swaps in the derivatives market, by way of inside
299   information that Lender had as a result of creating the faulty loans sure to default.  Lender was
300   then free to invest on the bet that said loan would default and stood to receive unjust enrichment
301   a third time.  This credit default swap derivative market scheme is almost totally responsible for
302   the stock market disaster we now experience as it was responsible for the stock market crash in
303   1907.

304   ### *LENDER CHARGED FALSE FEES*

305   Lender charged fees to Petitioner that were in violation of the limitations imposed by the Real
306   Estate Settlement Procedures Act as said fees were simply contrived and not paid to a third party
307   vendor.

308   Lender charged other fees that were a normal part of doing business and should have been
309   included in the finance charge.

310   Below is a listing of the fees charged at settlement.  Neither at settlement, nor at any other time
311   did Lender or Trustee provide documentation to show that the fees herein listed were valid,
312   necessary, reasonable, and proper to charge Petitioner.

| 801 | Loan Origination Fee | 5% | $10,536.02 |
|------|----------------------|-----|------------|
| 808 | Document Preparation Fee | | $200.00 |
| 809 | Tax Service Fee | | $50.00 |
| 1101 | Settlement Fee | | $135.00 |
| 1108 | Title Insurance | | $585.63 |
| 1201 | Recording Fee | | $50.00 |

313   Debtor is unable to determine whether or not the above fees are valid in accordance with the
314   restrictions provided by the various consumer protection laws.  Therefore, please provide; a
315   complete billing from each vendor who provided the above listed services; the complete contact

316  information for each vendor who provided a billed service; clearly stipulate as to the specific
317  service performed; a showing that said service was necessary; a showing that the cost of said
318  service is reasonable; a showing of why said service is not a regular cost of doing business that
319  should rightly be included in the finance charge.

320  The above charges are hereby disputed and deemed unreasonable until such time as said charges
321  have been demonstrated to be reasonable, necessary, and in accordance with the limitations and
322  restrictions included in any and all laws, rules, and regulations intended to protect the consumer.

323  In the event lender fails to properly document the above charges, borrower will consider same as
324  false charges.  The effect of the above amounts that borrower would pay over the life of the note
325  will be an overpayment of $114,405.79  This amount will be reduced by the amount of items
326  above when said items are fully documented.

327  ***RESPA PENALTY***

328  From a cursory examination of the records, with the few available, the apparent RESPA
329  violations are as follows: Good Faith Estimate not within limits, No HUD-1 Booklet, Truth In
330  Lending Statement not within limits compared to Note, Truth in Lending Statement not timely
331  presented, HUD-1 not presented at least one day before closing, No Holder Rule Notice in Note,
332  No 1st Payment Letter.

333   The closing documents included no signed and dated :  Financial Privacy Act Disclosure; Equal
334  Credit Reporting Act Disclosure; notice of right to receive appraisal report; servicing disclosure
335  statement; borrower's Certification of Authorization; notice of credit score; RESPA servicing
336  disclosure letter; loan discount fee disclosure; business insurance company arrangement
337  disclosure; notice of right to rescind.

338  The courts have held that the borrower does not have to show harm to claim a violation of the
339  Real Estate Settlement Procedures Act, as the Act was intended to insure strict compliance.  And,
340  in as much as the courts are directed to assess a penalty of no less than two hundred dollars and
341  no more than two thousand, considering the large number enumerated here, it is reasonable to
342  consider that the court will assess the maximum amount for each violation.

343  Since the courts have held that the penalty for a violation of RESPA accrues at consummation of
344  the note, borrower has calculated that, the number of violations found in a cursory examination
345  of the note, if deducted from the principal, would result in an overpayment on the part of the
346  borrower, over the life of the note, of $117,834.81.

PRELIMINARY INJUNCTION          12 of 26

347  If the violation penalty amounts for each of the unsupported fees listed above are included, the
348  amount by which the borrower would be defrauded is $253,073.87

349  Adding in RESPA penalties for all the unsupported settlement fees along with the TILA/Note
350  variance, it appears that lender intended to defraud borrower in the amount of $485,314.47

### *LENDER CONSPIRED WITH APPRAISER*

352  Lender, in furtherance of the above referenced conspiracy, conspired with appraiser for the
353  purpose of preparing an appraisal with a falsely stated price, in violation of appraiser's fiduciary
354  duty to Petitioner and appraiser's duty to provide fair and honest services, for the purpose of
355  inducing Petitioner to enter into a loan product that was fraudulent toward the interests of
356  Petitioner.

### *LENDER CONSPIRED WITH TRUSTEE*

358  Lender conspired with the trust Agent at closing to create a condition of stress for the specific
359  purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and
360  fully understand what was being signed.

361  The above referenced closing procedure was a carefully crafted connivance, designed and
362  intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty
363  to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner
364  did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure
365  as required by various consumer protection statutes.

### *DECEPTIVE ADVERTISING AND OTHER UNFAIR BUSINESS PRACTICES*

367  In the manner in which Defendants have carried on their business enterprises, they have engaged
368  in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45* et seq.
369  (Deceptive Practices Act).

370  Such conduct comprises a pattern of business activity within the meaning of such statutes, and
371  has directly and proximately caused Petitioner to suffer economic and non-economic harm and
372  detriment in an amount to be shown according to proof at trial of this matter.

373    ***EQUITABLE TOLLING FOR TILA AND RESPA***

374    The Limitations Period for Petitioners' Damages Claims under TILA and RESPA should be
375    Equitably Tolled due to the DEFENDANTS' Misrepresentations and Failure to Disclose.

376    Any claims for statutory and other money damages under the Truth in Lending Act *(15 U.S.C. §*
377    *1601,* et. seq.) and under the Real Estate Settlement Procedures Act *(12 U.S.C. § 2601* et. seq.)
378    are subject to a one-year limitations period; however, such claims are subject to the equitable
379    tolling doctrine. The Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as
380    subject to equitable tolling. In *King v. California, 784 F.2d 910 (9th Cir.1986),* the court held
381    that given the remedial purpose of TILA, the limitations period should run from the date of
382    consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate
383    circumstances, suspend the limitations period until the borrower discovers or has reasonable
384    opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King*
385    *v. California, 784 F.2d 910, 915 9*th Cir. 1986).

386    Likewise, while the Ninth Circuit has not taken up the question whether *12 U.S.C. § 2614,* the
387    anti-kickback provision of **RESPA,** is subject to equitable tolling, other Courts have, and hold
388    that such limitations period may be equitably tolled. The Court of Appeals for the District of
389    Columbia held that § 2614 imposes a strictly jurisdictional limitation, *Hardin v. City Title &*
390    *Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986),* while the Seventh Circuit came to the
391    opposite conclusion. *Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1164 (7th*
392    *Cir. 1997).* District courts have largely come down on the side of the Seventh Circuit in holding
393    that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v.*
394    *Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co.,*
395    *700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988).* Importantly, the Ninth Circuit, as noted above, has
396    interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the
397    language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914.* While not
398    of precedential value, this Court has previously found both the TILA and **RESPA** limitations
399    periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504*
400    *F.Supp.2d 1091,* (W.D. Wash. 2007). 1106-07.

401    The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay
402    by the Petitioner," and inquires whether "a reasonable Petitioner would ... have known of the
403    existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d*

404   *409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000).*
405   Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on
406   any wrongful conduct by the Defendants. Santa Maria. at 1178.

407   ### BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING
408   ### STANDARDS

409   Traditionally, Lenders required borrowers seeking mortgage loans to document their income and
410   assets by, for example, providing W-2 statements, tax returns, bank statements, documents
411   evidencing title, employment information, and other information and documentation that could
412   be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's
413   ability to repay a particular loan over both the short and long term. Defendants deviated from and
414   disregarded these standards, particularly with regard to its riskier and more profitable loan
415   products.

416   **Low-Documentation/No-Documentation Loans.**

417   Driven by its desire for market share and a perceived need to maintain competitiveness with the
418   likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no
419   documentation loan products, including the ARMs and HELOCs described hereinabove, and
420   began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to
421   the already eased underwriting standards to the point of disregarding such standards. This
422   quickened the loan origination process, allowing for the generation of more and more loans
423   which could then be resold and/or securitized in the secondary market.

424   Defendants marketed no-documentation/low-documentation loan programs that included ARMs
425   and HELOCs, among others, in which loans were given based on the borrower's "stated income"
426   or "stated assets" (SISA) neither of which were verified. Employment was verbally confirmed, if
427   at all, but not further investigated. and income, if it was even considered as a factor, was to be
428   roughly consistent with incomes in the types of jobs in which the borrower was employed. When
429   borrowers were requested to document their income, they were able to do so through information
430   that was less reliable than in a full-documentation loan.

431   For stated income loans, it became standard practice for loan processors, loan officers and
432   underwriters to rely on www.salary.com to see if a stated income was reasonable.  Such stated
433   income loans, emphasizing loan origination from a profitability standpoint at the expense of

434  determining the ability of the borrower to repay the loan from an underwriting standpoint,
435  encouraged the overstating and/or fabrication of income.

436  **Easing of Underwriting Standards**

437  In order to produce more loans that could be resold in the secondary mortgage market,
438  Defendants also relaxed, and often disregarded, traditional underwriting standards used to
439  separate acceptable from unacceptable risk. Examples of such relaxed standards were reducing
440  the base FICO score needed for a SISA loan.

441  Other underwriting standards that Defendants relaxed included qualifying interest rates (the rate
442  used to determine whether borrowers can afford the loan), loan to value ratios (the amount of
443  loan(s) compared to the appraised/sale price of the property, whichever is lower), and debt-to-
444  income ratios (the amount of monthly income compared to monthly debt service payments and
445  other monthly payment obligations.

446  With respect to ARMS, Defendants underwrote loans without regard to the borrower's long-term
447  financial circumstances, approving the loan based on the initial fixed rate without taking into
448  account whether the borrower could afford the substantially higher payment that would
449  inevitably be required during the remaining term of the loan.

450  With respect to HELOCs, Defendants underwrote and approved such loans based only on the
451  borrower's ability to afford the interest-only payment during the initial draw period of the loan,
452  rather than on the borrower's ability to afford the subsequent, fully amortized principal and
453  interest payments.

454  As Defendants pushed to expand market share, they eased other basic underwriting standards.
455  For example, higher loan-to-value (LTV) and combined loan-to-value (CLTV) ratios were
456  allowed. Likewise, higher debt-to-income (DTI) ratios were allowed. At the same time that they
457  eased underwriting standards the Defendants also were encouraging consumers to go further into
458  debt in order to supply the very lucrative aftermarket of mortgage backed securities.  The relaxed
459  underwriting standards created the aftermarket supply they needed. As a result, the Defendants
460  made it easy for the unwary consumer to take on more debt than he could afford by encouraging
461  unsound financial practices, all the while knowing defaults would occur more and more
462  frequently as the credit ratios of citizens reached the limit of the new relaxed underwriting
463  standards.

464    Defendants knew, or in the exercise of reasonable care should have known, from its own
465    underwriting guidelines industry standards that it was accumulating and selling/reselling risky
466    loans that were likely to end up in default. However, as the pressure mounted to increase market
467    share and originate more loans, Defendants began to grant "exceptions" even to its relaxed
468    underwriting guidelines. Such was the environment that loan officers and underwriters were,
469    from time to time, placed in the position of having to justify why they did not approve a loan that
470    failed to meet underwriting criteria.

471    **Risk Layering**

472    Defendants compromised its underwriting even further by risk layering, i.e. combining high risk
473    loans with one or more relaxed underwriting standards.

474    Defendants knew, or in the exercise of reasonable care should have known, that layered risk
475    would increase the likelihood of default. Among the risk layering Defendants engaged in were
476    approving ARM loans with little to no down payment, little to no documentation, and high
477    DTI/LTV/CLTV ratios. Despite such knowledge, Defendants combined these very risk factors in
478    the loans it promoted to borrowers.

479    Loan officers and mortgage Agents aided and abetted this scheme by working closely with other
480    mortgage Lenders/mortgage bankers to increase loan originations, knowing or having reason to
481    believe that Defendants and other mortgage Lenders/mortgage bankers with whom they did
482    business ignored basic established underwriting standards and acted to mislead the borrower, all
483    to the detriment of the borrower and the consumer of loan products..

484    Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them,
485    engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the
486    business practices described above in paragraphs 30-42 of this Complaint

487    ***UNJUST ENRICHMENT***

488    Petitioner is informed and believes that each and all of the Defendants received a benefit at
489    Petitioner's expense, including but not limited to the following: To the Agent, commissions,
490    yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to
491    be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums,
492    surcharges and other "back end" payments in amounts to be proved at trial; To the investors,

493 resale premiums, and high rates of return; To the servicers including EMS, servicing fees,
494 percentages of payment proceeds, charges, and other "back end" payments in amounts to be
495 proved at trial; To all participants, the expectation of future revenues from charges, penalties and
496 fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

497 By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants,
498 and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly
499 deprived, and is entitled to restitution in the amount of $485,314.47

500 ### CLAIM TO QUIET TITLE.

501 Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and
502 the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title
503 interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission
504 and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

505 Defendants have no title, estate, lien, or interest in the Subject Property in that the purported
506 power of sale contained in the Deed of Trust is of no force or effect because Defendants' security
507 interest in the Subject Property has been rendered void and that the Defendants are not the holder
508 in due course of the Promissory Note. Moreover, because Petitioner properly pled all Defendants'
509 involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-conspirators,

510 "a Petitioner is entitled to damages from those Defendants who concur in the tortuous
511 scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co., 24 Cal.*
512 *3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, Inc.*
513 *v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d*
514 *27 (1st Dist. 2006); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal.*
515 *Rptr. 2d 752 (2d Dist. 1995).*

516 ### SUFFICIENCY OF PLEADING

517 Petitioner has sufficiently pled that relief can be granted on each and every one of the
518 Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond
519 doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would
520 entitle Petitioner to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All
521 allegations of material fact in the complaint are taken as true and construed in the light most
522 favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

523  Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc.
524  8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal
525  theories, and seeks remedies to which Petitioner is entitled.  *Balistreri v. Pacifica Police Dept., 901 F.2d*
526  *696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal
527  conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court
528  should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752* (9th Cir, 1994). Lastly,
529  Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of
530  their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore,
531  relief as requested herein should be granted.

532  **CAUSES OF ACTION**

533  ***BREACH OF FIDUCIARY DUTY***

534  Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary
535  duty of care with respect to the mortgage loan transactions and related title activities involving
536  the Trust Property.

537  Defendants breached their duties to Petitioner by, *inter alia,* the conduct described above. Such
538  breaches included, but were not limited to, ensuring their own and Petitioners' compliance with
539  all applicable laws governing the loan transactions in which they were involved, including but
540  not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

541  Defendant's breaches of said duties were a direct and proximate cause of economic and non-
542  economic harm and detriment to Petitioner(s).

543  Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct,
544  all to be shown according to proof at trial of this matter.

545  ***CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE***

546  Defendants owed a general duty of care with respect to Petitioners, particularly concerning their
547  duty to properly perform due diligence as to the loans and related transactional issues described
548  hereinabove.

549  In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations
550  X and Z promulgated there under to, among other things, provide proper disclosures concerning
551  the terms and conditions of the loans they marketed, to refrain from marketing loans they knew

552  or should have known that borrowers could not afford or maintain, and to avoid paying undue
553  compensation such as "yield spread premiums" to mortgage Agents and loan officers.

554  Defendants knew or in the exercise of reasonable care should have known, that the loan
555  transactions involving Petitioner and other persons similarly situated were defective, unlawful,
556  violative of federal and state laws and regulations, and would subject Petitioner to economic and
557  non-economic harm and other detriment.

558  Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and
559  Z promulgated there under were intended and designed to protect, and the conduct alleged
560  against Defendants is the type of conduct and harm which the referenced statutes and regulations
561  were designed to deter.

562  As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and
563  non-economic harm in an amount to be shown according to proof at trial.

564  ### *AGENT: COMMON LAW FRAUD*

565  If any Agents' misrepresentations made herein were not intentional, said misrepresentations were
566  negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable
567  ground for believing them to be true.

568  Agents made these representations with the intention of inducing Petitioner to act in reliance on
569  these representations in the manner hereafter alleged, or with the expectation that Petitioner
570  would so act.

571  Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents
572  in their negligent misrepresentation, and that various Agents were negligent in not implementing
573  procedures such as underwriting standards oversight that would have prevented various Agents
574  from facilitating the irresponsible and wrongful misrepresentations of various Agents to
575  Defendants.

576  Petitioner is informed and believes that Agent acted in concert and collusion with others named
577  herein in promulgating false representations to cause Petitioner to enter into the LOAN without
578  knowledge or understanding of the terms thereof.

579  As a proximate result of the negligent misrepresentations of Agents as herein alleged, the
580  Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of
581  opportunities, attorney fees and costs, and other damages to be determined at trial. As a
582  proximate result of Agents' breach of duty and all other actions as alleged herein, Plaintiff has
583  suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and
584  mental and physical pain and anguish, all to Petitioner's damage in an amount to be established
585  at trial.

586  ***PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED***
587  ***COVENANT OF GOOD FAITH AND FAIR DEALING.***

588  Petitioner properly pled Defendants violated the breach of implied covenant of good faith and
589  fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its
590  performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261*
591  *Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v.*
592  *Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v*
593  *Jones, (2004) 33 Cal. 4th 917,* the court stated:

594  In the area of insurance contracts the covenant of good faith and fair dealing has taken on a
595  particular significance, in part because of the special relationship between the insurer and the
596  insured. The insurer, when determining whether to settle a claim, must give at least as much
597  consideration to the welfare of its insured as it gives to its own interests. . . The standard is
598  premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

599  Likewise, there is a special relationship between an Agent and borrower. "A person who
600  provides Agency services to a borrower in a covered loan transaction by soliciting Lenders or
601  otherwise negotiating a consumer loan secured by real property, is the fiduciary of the
602  consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the Agent may
603  be acting as an Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in
604  *good faith.* If the *Agent knew or should have known that the Borrower will or has a likelihood of*
605  *defaulting ... they have a fiduciary duty to the borrower not* to place them in that loan."
606  (California Department of Real Estate, *Section 8: Fiduciary Responsibility,* www.dre.ca.gov).
607  [*Emphasis Added*].

608  All Defendants, willfully breached their implied covenant of good faith and fair dealing with
609  Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to

PRELIMINARY INJUNCTION              21 of 26

610    provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan
611    product without regard for other more affordable products; (4) Placed Petitioner into a loan
612    without following proper underwriting standards; (5) Failed to disclose to Petitioner that
613    Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform
614    valid and /or properly documented substitutions and assignments so that Petitioner could
615    ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's
616    request for documentation of the servicing of Petitioner's loan and the existence and content of
617    relevant documents. Additionally, Defendants breached their implied covenant of good faith and
618    fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the
619    right under an alleged power of sale because the purported assignment was not recorded and by
620    willfully and knowingly financially profiting from their malfeasance. Therefore, due to the
621    special relationship inherent in a real estate transaction between Agent and borrower, *and* all
622    Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

623    ***CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET***
624    ***SEQ***

625    Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation
626    contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of
627    Action as though the same were set forth herein.

628    Petitioner is informed and believes that Defendant's violation of the provisions of law rendered
629    the credit transaction null and void, invalidates Defendant's claimed interest in the Subject
630    Property, and entitles Petitioner to damages as proven at trial.

631    ***INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS***

632    The conduct committed by Defendants, driven as it was by profit at the expense of increasingly
633    highly leveraged and vulnerable consumers who placed their faith and trust in the superior
634    knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by
635    civilized society.

636    Defendants either knew that their conduct would cause Petitioner to suffer severe emotional
637    distress, or acted in conscious and/or reckless disregard of the probability that such distress
638    would occur.

639  Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the
640  conduct of Defendants as described hereinabove.

641  As a result of such severe emotional distress, Petitioner suffered economic and non economic
642  harm and detriment, all to be shown according to proof at trial of this matter.

643  Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by
644  Petitioner and secure to Petitioner quite title;

645  Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner
646  as payments to Defendants based on the fraudulently secured promissory note in an amount to be
647  calculated by Defendants and verified to Petitioner;

648  Petitioner further demands that Defendants pay to Petitioner an amount equal to treble the
649  amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be
650  equal to $1,455,943.41

651  **REQUEST FOR TEMPORARY INJUNCTION**

652  Plaintiff will suffer imminent and irreparable injury if defendant is not enjoined from
653  foreclosing on the property owned by Plaintiff. Fed. R. Civ. P. 65(b)(1); *see Sampson v. Murray*,
654  415 U.S. 61, 88-89 & n.59, 94 S. Ct. 937, 951-52 & n.59 (1974).

655  There is no adequate remedy at law because once the foreclosure sale has taken place
656  Plaintiff will suffer the complete loss of the property as defendant will sell the property to a third
657  party who will have a right to possession without regard to the claims Plaintiff has against
658  defendant. {*See N. Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306, 105 S.*
659  *Ct. 459, 459 (1984); Wilson v. Ill. S. Ry. Co., 263 U.S. 574, 576-77, 44 S. Ct. 203, 203-04*
660  *(1924); Winston v. Gen. Drivers, Warehousemen & Helpers Local Un. No. 89, 879 F. Supp. 719,*
661  *725 (W.D. Ky. 1995.*

662  There is a substantial likelihood that plaintiff will prevail on the merits. *Schiavo v. Schiavo*,
663  403 F.3d 1223, 1225 (11th Cir. 2005). Plaintiff will be able to show that:

664  •  that the alleged real party in interest is unable to prove standing to foreclose against
665     and sell the property;

666  •  Defendant has no agency to represent the real party in interest;

667    • that the lender committed numerous acts, as listed above, that have the effect of
668         rendering the contract, through which defendant claims authority, void and
669         unenforceable.

670    The threatened harm to plaintiff outweighs the harm that a preliminary injunction would
671    inflict on defendant. *Schiavo*, 403 F.3d at 1225-26. If defendant is temporarily restrained from
672    selling the instant property, the defendant and plaintiff will benefit as if plaintiff is forced to
673    vacate the property, the property will sit empty for the duration of the action. Plaintiff will suffer
674    loss of the use of said property and will loose opportunity to maintain same and defendant will
675    suffer loss by having to maintain an empty property that cannot be insured.

676    Issuance of a preliminary injunction would not adversely affect the public interest and public
677    policy because there are already a great number of empty houses with the current residential
678    foreclosure mess. Adding more will simply increase the burden on the local as it will create
679    opportunity for vandalism and further other criminal activity.

680    Plaintiff is willing to post a bond in the amount the court deems appropriate.

681    The court should enter this preliminary injunction without notice to defendant because
682    plaintiff will suffer immediate and irreparable injury, loss, or damage if the order is not granted
683    before defendant can be heard as **defendant has scheduled the above referenced sale for the**
684    **week of December 12th, 2010.** *First Tech. Safety Sys. v. Depinet*, 11 F.3d 641, 650 (6th Cir.
685    1993). If said sale is allowed to take place, Plaintiff will be irreparably harm. {*See O'Connor's*
686    *Federal Rules, "Ex parte," ch. 2-D, §3.1.3, p. 77.*}

687    Plaintiff asks the court to set the request for a preliminary injunction for hearing at the
688    earliest possible time.

689                              **CONCLUSION**
690    13. Plaintiff has filed suit against defendant wherein Plaintiff has claimed numerous causes
691    of action against defendant. A number of the allegations made by Plaintiff are incontrovertable
692    by defendant, therefore, Plaintiff will prevail on a number of the above allegations by way if
693    existing records. For these reasons, plaintiff asks the court to issue a preliminary injunction
694    preventing defendant from foreclosing on the property.

PRELIMINARY INJUNCTION         24 of 26

695                                                **PRAYER**

696      15. For these reasons, plaintiff asks that the court do the following:

697      a.    Defendant be prevented from foreclosing on and selling the property until and
698            unless defendant prevails in the current litigation.

699      b.    Enter judgment for plaintiff.

700      c.    Award costs of court.

701      d.    Grant any other relief it deems appropriate.

702   **Respectfully Submitted,**
703
704
705   **Denise Cook**                          **Kenneth Cook**

# VERIFICATION

706

707

708

709 We, Denise & Kenneth Cook , do swear and affirm that all statements made herein are true and
710 accurate, in all respects, to the best of my knowledge.

711 Denise & Kenneth Cook
712 300 Newt Gulch Road
713 Wilderville , OR

714

715

716 **Denise Cook**                                    **Kenneth Cook**

717

718

719 The Person above, who proved to me on the basis of satisfactory evidence to be the person

720 whose name is subscribed to this document and acknowledged to me that he/she executed the

721 same in his authorized capacity and that by his signature on this instrument who is the person

722 who executed this instrument.

723 I certify under PENALTY OF PERJURY under the laws of this State that the foregoing

724 paragraph is true and correct.

725

726 Witness my hand and official seal.

727

728

729 **NOTARY PUBLIC IN AND FOR**                    Notary Seal

730 **THE STATE OF OREGON**

731

OFFICIAL SEAL
**JUDITH F COOME**
NOTARY PUBLIC - OREGON
COMMISSION NO. 450081
MY COMMISSION EXPIRES JUNE 16, 2014

PRELIMINARY INJUNCTION              26 of 26