# EXHIBIT D

1 Richard & Mary Hartzell
2 2511 NE Yucca Ave
3 Redmond OR 97756

4 UNITED STATES DISTRICT COURT
5 DISTRICT OF OREGON

| | |
|---|---|
| **Richard & Mary Hartzell** | Case # _10--6231-HO_ |
| Plaintiff, | |
| vs. | **ORIGINAL PETITION** |
| **US Bank, NA** | |
| Defendant | |

6

7 Date: _____

8 Comes now Richard & Mary Hartzell, hereinafter referred to as "Petitioner," and

9 moves the court for relief as herein requested:

10 **PARTIES**

11 Petitioner is Richard & Mary Hartzell, 2511 NE Yucca Ave  Redmond OR 97756. Currently

12 Known Defendant(s) are/is: US Bank NA , 4325 17th Avenue Southwest , Fargo , ND  58103,

13 by and through its attorney.

14 **STATEMENT OF CAUSE**

15 Petitioner, entered into a consumer contract for the refinance of a primary residence located at

16 2511 NE Yucca Ave  Redmond OR 97756, hereinafter referred to as the "property."

17 Defendants, acting in concert and collusion with others, induced Petitioner to enter into a

18 predatory loan agreement with Defendant.

19 Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully

20 crafted scheme intended to defraud Petitioner.

21 Defendants failed to make proper notices to Petitioner that would have given Petitioner warning

22 of the types of tactics used by Defendants to defraud Petitioner.

23 Defendants charged false fees to Petitioner at settlement.

ORIGINAL PETITION                                                    1 of 22

24 **IN BRIEF**

25 *(Non-factual Statement of Posture and Position)*

26 It is not the intent of Petitioner to indict the entire industry. It is just that Plaintiff will be
27 making a number of allegations that, outside the context of the current condition of the real
28 estate industry, may seem somewhat outrageous and counter-intuitive.

29 When Petitioner accuses ordinary individuals of acting in concert and collusion with an
30 ongoing criminal conspiracy, it tends to trigger an incredulous response as it is
31 unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary
32 people, just doing what they have been trained to do, are out to swindle the poor
33 unsuspecting borrower.

34 The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud
35 committed by people acting in concert and collusion, one with the other. Petitioner has no
36 reason to believe that the Agent, loan officer, appraiser, and others were consciously aware
37 that what they were doing was part of an ongoing criminal conspiracy, only that it was,
38 and they, at the very least, kept themselves negligently uninformed of the wrongs they
39 were perpetrating. Petitioner maintains the real culprit is the system itself, including the
40 courts, for failure to strictly enforce the consumer protection laws.

41 **CAREFULLY CRAFTED CRIMINAL CONNIVANCE**

42 *(General State of the Real Estate Industry)*

43 ***THE BEST OF INTENTIONS***

44 Prior to the 1980's and 1990's ample government protections were in place to protect
45 consumers and the lending industry from precisely the disaster we now experience.
46 During President Clinton's administration, under the guise of making housing available to
47 the poor, primary protections were relaxed which had the effect of releasing the
48 unscrupulous on the unwary.

49 Prior to deregulation in the 1980's, lenders created loans for which they held and assumed
50 the risk. Consequently, Americans were engaged in safe and stable home mortgages.
51 With the protections removed, the unscrupulous lenders swooped in and, instead of
52 making loans available to the poor, used the opportunity to convince the unsophisticated
53 American public to do something that had been traditionally taboo; home buyers were
54 convinced to speculate with their homes, their most important investment.

ORIGINAL PETITION                                                                 2 of 22

55    US Bank NA , Ameriquest, Countrywide, and many others swooped in and convinced
56    Americans to sell their homes, get out of their safe mortgage agreements, and speculate
57    with the equity they had gained by purchasing homes they could not afford. Lenders
58    created loans intended to fail as, under the newly crafted system, the Lender profited more
59    from a mortgage default than from a stable loan.

60    Companies cropped up who called themselves banks when, in fact, they were only either
61    subsidiaries of banks, or unaffiliated companies that were operated for the purpose of
62    creating and selling promissory notes. As will be demonstrated, these companies then
63    profited from the failure of the underlying loans.

64    ***HOW IT WORKS***

65    Briefly, how it works is this, the Lender would secure a large loan from a large bank,
66    convert that loan into 20 and 30 year mortgages and then sell the promise to pay to an
67    investor.

68    People would set up mortgage companies buy securing a large loan from one of the major
69    banks, then convert that loan into 20 and 30 year mortgages. In order to accomplish this
70    an Agent would contract with a seller to find a buyer, bring both seller and buyer to a
71    lender who would secure the title from the seller using the borrowed bank funds for that
72    purpose, and then trade the title to the buyer in exchange for a promissory note.

73    The lender then creates a 20 or 30 year mortgage with money the lender must repay within
74    6 months. As soon as the closing is consummated, the promissory note is sold to an
75    investor pool.

76    The lender signed over the promissory note to the investor at the time of the trade, but did
77    not sign over the lien document (mortgage or deed of trust). The State of Kansas Supreme
78    Court addressed this issue and stated that such a transaction was certainly legal. However,
79    it created a fatal flaw as the holder of the lien document, at time of sale of the security
80    instrument, received consideration in excess of the lien amount. Since the lien holder
81    received consideration, he could not be harmed. Therefore the lien became an
82    unenforceable document.

83    This begs the question: if keeping the lien would render it void, why would the lender not
84    simply transfer the lien with the promissory note? The reason is because the lender will
85    hold the lien for three years, file an Internal Revenue Service Form 1099a, claim the full

86    amount of the lien as abandoned funds, and deduct the full amount from the lender's tax
87    liability. The lender, by this maneuver, gets consideration a second time. And still the
88    lender is not done profiting from the deal.

89    After sale of the promissory note, the lender remains as the servicer for the investor. The
90    lender will receive 3% of each payment the lender collects and renders to the investor
91    pool. However, if the payment is late, the lender is allowed to assess an extra 5% and keep
92    that amount. Also, if the loan defaults, the lender stands to gain thousands for handling the
93    foreclosure.

94    The lender stands to profit more from a note that is overly expensive, than from a good
95    stable loan. And where, you may ask, does all this profit come from? It comes from the
96    equity the borrower had built up in the home. And still the lender is not finished profiting
97    from the deal.

98    Another nail was driven in the American financial coffin when on the last day Congress
99    was in session in 2000 when restrictions that had been in place since the economic
100   collapse of 1907 were removed. Until 1907 investors were allowed to bet on stocks
101   without actually buying them. This unbridled speculation led directly to an economic
102   collapse. As a result the legislature banned the practice, until the year 2000. In 2000 the
103   unscrupulous lenders got their way on the last day of the congressional session. Congress
104   removed the restriction banning derivatives and again allowed the practice, this time
105   taking only 8 years to crash the stock market. This practice allowed the lender to profit
106   further from the loan by betting on the failure of the security instrument he had just sold to
107   the unwary investor, thus furthering the purpose of the lender to profit from both the
108   borrower (consumer) and the investor.

109   The failure of so many loans recently resulted in a seven hundred and fifty billion dollar
110   bailout at the expense of the taxpayer. The unsuspecting consumer was lulled into
111   accepting the pronouncements of the lenders, appraisers, underwriters, and trustees as all
112   were acting under the guise of government regulation and, therefore, the borrower had
113   reason to expect good and fair dealings from all. Unfortunately, the regulations in place to
114   protect the consumer from just this kind of abuse were simply being ignored.

115   The loan origination fee from the HUD1 settlement statement is the finder's fee paid for
116   the referral of the client to the lender by a person acting as an agent for the borrower.
117   Hereinafter, the person or entity who receives any portion of the yield spread premium, or

ORIGINAL PETITION                             4 of 22

118  a commission of any kind consequent to securing the loan agreement through from the
119  borrower will be referred to as "Agent." The fee, authorized by the consumer protection
120  law is restricted to 1% of the principal of the note. It was intended that the Agent, when
121  seeking out a lender for the borrower, would seek the best deal for his client rather than
122  who would pay him the most. That was the intent, but not the reality. The reality is that
123  Agents never come away from the table with less than 2% or 3% of the principal. This is
124  accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his
125  fiduciary duty to the borrower and convince the borrower to accept a more expensive loan
126  product than the borrower qualifies for. This will generate more profits for the lender and,
127  consequently, for the Agent.

128  It is a common practice for lenders to coerce appraisers to give a higher appraisal than is
129  the fair market price. This allows the lender to increase the cost of the loan product and
130  give the impression that the borrower is justified in making the purchase.

131  The lender then charges the borrower an underwriting fee in order to convince the
132  borrower that someone with knowledge has gone over the conditions of the note and
133  certified that they meet all legal criteria. The trustee, at closing, participates actively in the
134  deception of the borrower by placing undue stress on the borrower to sign the large stack
135  of paperwork without reading it. The trustee is, after all, to be trusted and has been paid to
136  insure the transaction. This trust is systematically violated for the purpose of taking unfair
137  advantage of the borrower. The entire loan process is a carefully crafted contrive
138  connivance designed and intended to induce the unsophisticated borrower into accepting a
139  loan product that is beyond the borrowers means to repay. With all this, it should be a
140  surprise to no one that this country is having a real estate crisis.

141  **PETITIONER WILL PROVE THE FOLLOWING**

142  Petitioner is prepared to prove, by a preponderance of evidence that:

143  • Lender has no legal standing to bring collection or foreclosure claims against the
144  property;

145  • Lender is not a real party in interest in any contract which can claim a collateral
146  interest in the property;

147      • even if Lender were to prove up a contract to which Lender had standing to enforce
148          against Petitioner, no valid lien exists which would give Lender a claim against the
149          property;

150      • even if Lender were to prove up a contract to which Lender had standing to enforce
151          against Petitioner, said contract was fraudulent in its creation as endorsement was
152          secured by acts of negligence, common law fraud, fraud by non-disclosure, fraud in
153          the inducement, fraud in the execution, usury, and breaches of contractual and
154          fiduciary obligations by Mortgagee or "Trustee" on the Deed of Trust, "Mortgage
155          Agents," "Loan Originators," "Loan Seller," "Mortgage Aggregator," "Trustee of
156          Pooled Assets," "Trustee or officers of Structured Investment Vehicle,"
157          "Investment Banker," "Trustee of Special Purpose Vehicle/Issuer of Certificates of
158          'Asset-Backed Certificates,'" "Seller of 'Asset-Backed' Certificates (shares or
159          bonds)," "Special Servicer" and Trustee, respectively, of certain mortgage loans
160          pooled together in a trust fund;

161      • Defendants have concocted a carefully crafted connivance wherein Lender
162          conspired with Agents, et al, to strip Petitioner of Petitioner's equity in the property
163          by inducing Plaintiff to enter into a predatory loan inflated loan product;

164      • Lender received unjust enrichment in the amount of 5% of each payment made late
165          to Lender while Lender and Lender's assigns acted as servicer of the note;

166      • Lender and Lender's assigns, who acted as servicer in place of Lender, profited by
167          handling the foreclosure process on a contract Lender designed to have a high
168          probability of default;

169      • Lender intended to defraud Investor by converting the promissory note into a
170          security instrument and selling same to Investor;

171      • Lender intended to defraud Investor and the taxpayers of the United States by
172          withholding the lien document from the sale of the promissory note in order that
173          Lender could then hold the lien for three years, then prepare and file Internal
174          Revenue Form 1099a and falsely claim the full lien amount as abandoned funds
175          and deduct same from Lender's income tax obligation;

176      • Lender defrauded backers of derivatives by betting on the failure of the promissory
177          note the lender designed to default;

ORIGINAL PETITION                                                                6 of 22

178      • participant Defendants, et al, in the securitization scheme described herein have
179          devised business plans to reap millions of dollars in profits at the expense of
180          Petitioner and others similarly situated.

181                          **PETITIONER SEEKS REMEDY**

182   In addition to seeking compensatory, consequential and other damages, Petitioner seeks
183   declaratory relief as to what (if any) party, entity or individual or group thereof is the
184   owner of the promissory note executed at the time of the loan closing, and whether the
185   Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory
186   Injunction requiring re-conveyance of the subject property to the Petitioner or, in the
187   alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

188   *PETITIONER HAS BEEN HARMED*

189   Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

190   Such harm and detriment includes economic and non-economic damages, and injuries to
191   Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

192   In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the
193   equitable relief requested herein is granted.

194                          **STATEMENT OF CLAIM**

195   *DEFENDANTS  LACK STANDING*

196          **No evidence of Contractual Obligation**

197   Defendants claim a controversy based on a contractual violation by Petitioner but Defendants
198   have failed to produce said contract. Even if Defendants produced evidence of the existence of
199   said contract in the form of an allegedly accurate photocopy of said document, a copy is only
200   hearsay evidence that a contract actually existed at one point in time.  A copy, considering the
201   present state of technology, could be easily altered. As Lender only created one original and that
202   original was left in the custody of Lender, it was imperative that Lender protect said instrument.

203   In as much as the Lender is required to present the original on demand of Petitioner, there can be
204   no presumption of regularity when the original is not so produced.   In as much as Lender has
205   refused Petitioner's request of the chain of custody of the security instrument in question by

ORIGINAL PETITION                                          7 of 22

206 refusing to identify all current and past real parties in interest, there is no way to follow said
207 chain of custody to insure, by verified testimony, that no alterations to the original provisions in
208 the contract have been made.    Therefore, the alleged copy of the original is only hearsay
209 evidence that an original document at one time existed.   Petitioner maintains that, absent
210 production of admissible evidence of a contractual obligation on the part of Petitioner,
211 Defendants are without standing to invoke the subject matter jurisdiction of the court.

212 **No Proper Evidence of Agency**

213 Defendants claim agency to represent the principal in a contractual agreement involving
214 Petitioner, however, Defendants have failed to provide any evidence of said agency other than a
215 pronouncement that agency has been assigned by some person, the true identity and capacity of
216 whom has not been established. Defendants can hardly claim to be agents of a principal then
217 refuse to identify said principal. All claims of agency are made from the mouth of the agent with
218 no attempt to provide admissible evidence from the principal.

219 Absent proof of agency, Defendants lack standing to invoke the subject matter jurisdiction of the
220 court.

221 **Special Purpose Vehicle**

222 Since the entity now claiming agency to represent the holder of the security instrument is not the
223 original lender, Petitioner has reason to believe that the promissory note, upon consummation of
224 the contract, was converted to a security and sold into a special purpose vehicle and now resides
225 in a Real Estate Mortgage Investment Conduit (REMIC)    as defined by the Internal Revenue
226 Code and as such, cannot be removed from the REMIC as such would be a prohibited
227 transaction.    If the mortgage was part of a special purpose vehicle and was removed on
228 consideration of foreclosure, the real party in interest would necessarily be the trustee of the
229 special purpose vehicle. Nothing in the pleadings of Defendants indicates the existence of a
230 special purpose vehicle, and the lack of a proper chain of custody documentation gives Petitioner
231 cause to believe defendant is not the proper agent of the real party in interest.

232 *CRIMINAL CONSPIRACY AND THEFT*

233 Defendants, by and through Defendant's Agents, conspired with other Defendants, et al, toward
234 a criminal conspiracy to defraud Petitioner. Said conspiracy but are not limited to acts of

235    negligence, breach of fiduciary duty, common law fraud, fraud by non-disclosure, and tortuous
236    acts of conspiracy and theft, to include but not limited to, the assessment of improper fees to
237    Petitioner by Lender, which were then used to fund the improper payment of commission fees to
238    Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

239    *AGENT PRACTICED UP-SELLING*

240    By and through the above alleged conspiracy, Agent practiced up-selling to Petitioner. In so
241    doing, Agent violated the trust relationship actively cultivated by Agent and supported by fact
242    that Agent was licensed by the state. Agent further defrauded Petitioner by failing to disclose
243    Agent's conspiratorial relationship to Lender, Agent violated Agent's fiduciary duty to
244    Petitioner and the duty to provide fair and honest services, through a series of carefully crafted
245    connivances, wherein Agent proactively made knowingly false and misleading statements of
246    alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead
247    Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of
248    a loan product offered by the Lender. Said loan product was more expensive than Petitioner
249    could legally afford. Agent acted with full knowledge that Petitioner would have made a
250    different decision had Agent given complete disclosure.

251    *FRAUDULENT INDUCEMENT*

252    Lender maliciously induced Petitioner to accept a loan product, Lender knew, or should have
253    known, Petitioner could not afford in order to unjustly enrich Lender.

254    *EXTRA PROFIT ON SALE OF PREDATORY LOAN PRODUCT*

255    Said more expensive loan product was calculated to produce a higher return when sold as a
256    security to an investor who was already waiting to purchase the loan as soon as it could be
257    consummated.

258    **Extra Commission for Late Payments**

259    Lender acted with deliberate malice in order to induce Petitioner to enter into a loan agreement
260    that Lender intended Petitioner would have difficulty paying. The industry standard payment to
261    the servicer for servicing a mortgage note is 3% of the amount collected. However, if the
262    borrower is late on payments, a 5% late fee is added and this fee is retained by the servicer.

263    Thereby, the Lender stands to receive more than double the regular commission on collections if
264    the borrower pays late.

265         **Extra Income for Handling Foreclosure**

266    Lender acted with deliberate malice in order to induce petitioner to enter into a loan agreement
267    on which Lender intended petitioner to default. In case of default, the Lender, acting as servicer,
268    receives considerable funds for handling and executing the foreclosure process.

269         **Credit Default Swap Gambling**

270    Lender, after deliberately creating a loan intended to default is now in a position to bet on credit
271    default swap, commonly referred to as a derivative as addressed more fully below. Since Lender
272    designed the loan to fail, betting on said failure is essentially a sure thing.

273    *LENDER ATTEMPTING TO FRAUDULENTLY COLLECT ON VOID LIEN*

274    Lender sold the security instrument after closing and received consideration in an amount in
275    excess of the lien held by Lender. Since Lender retained the lien document upon the sale of the
276    security instrument, Lender separated the lien from said security instrument, creating a fatal and
277    irreparable flaw.

278    When Lender received consideration while still holding the lien and said consideration was in
279    excess of the amount of the lien, Lender was in a position such that he could not be harmed and
280    could not gain standing to enforce the lien. The lien was, thereby, rendered void.

281    Since the separation of the lien from the security instrument creates such a considerable concern,
282    said separation certainly begs a question: "Why would the Lender retain the lien when selling the
283    security instrument?"

284    When you follow the money the answer is clear. The Lender will hold the lien for three years,
285    then file an IRS Form 1099a and claim the full amount of the lien as abandoned funds and deduct
286    the full amount from Lender's tax liability, thereby, receiving consideration a second time.

287    Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the
288    lien to the holder of the security, however, the lien once satisfied, does not gain authority just
289    because the holder, after receiving consideration, decides to transfer it to someone else.

ORIGINAL PETITION                                                        10 of 22

290    *LENDER PROFIT BY CREDIT DEFAULT SWAP DERIVATIVES*

291    Lender further stood to profit by credit default swaps in the derivatives market, by way of inside
292    information that Lender had as a result of creating the faulty loans sure to default. Lender was
293    then free to invest on the bet that said loan would default and stood to receive unjust enrichment
294    a third time. This credit default swap derivative market scheme is almost totally responsible for
295    the stock market disaster we now experience as it was responsible for the stock market crash in
296    1907.

297    *LENDER CONSPIRED WITH APPRAISER*

298    Lender, in furtherance of the above referenced conspiracy, conspired with appraiser for the
299    purpose of preparing an appraisal with a falsely stated price, in violation of appraiser's fiduciary
300    duty to Petitioner and appraiser's duty to provide fair and honest services, for the purpose of
301    inducing Petitioner to enter into a loan product that was fraudulent toward the interests of
302    Petitioner.

303    *LENDER CONSPIRED WITH TRUSTEE*

304    Lender conspired with the trust Agent at closing to create a condition of stress for the specific
305    purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and
306    fully understand what was being signed.

307    The above referenced closing procedure was a carefully crafted connivance, designed and
308    intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty
309    to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner
310    did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure
311    as required by various consumer protection statutes.

312    *DECEPTIVE ADVERTISING AND OTHER UNFAIR BUSINESS PRACTICES*

313    In the manner in which Defendants have carried on their business enterprises, they have engaged
314    in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45* et seq.
315    (Deceptive Practices Act).

ORIGINAL PETITION                                                    11 of 22

316   Such conduct comprises a pattern of business activity within the meaning of such statutes, and

317   has directly and proximately caused Petitioner to suffer economic and non-economic harm and

318   detriment in an amount to be shown according to proof at trial of this matter.

319      *EQUITABLE TOLLING FOR TILA AND RESPA*

320   The Limitations Period for Petitioners' Damages Claims under TILA and RESPA should be

321   Equitably Tolled due to the DEFENDANTS' Misrepresentations and Failure to Disclose.

322   Any claims for statutory and other money damages under the Truth in Lending Act *(15 U.S.C. §*

323   *1601,* et. seq.) and under the Real Estate Settlement Procedures Act *(12 U.S.C. § 2601* et. seq.)

324   are subject to a one-year limitations period; however, such claims are subject to the equitable

325   tolling doctrine. The Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as

326   subject to equitable tolling. In *King v. California, 784 F.2d 910 (9th Cir.1986),* the court held

327   that given the remedial purpose of TILA, the limitations period should run from the date of

328   consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate

329   circumstances, suspend the limitations period until the borrower discovers or has reasonable

330   opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King*

331   *v. California, 784 F.2d 910, 915 9*th Cir. 1986).

332   Likewise, while the Ninth Circuit has not taken up the question whether *12 U.S.C. § 2614,* the

333   anti-kickback provision of **RESPA,** is subject to equitable tolling, other Courts have, and hold

334   that such limitations period may be equitably tolled. The Court of Appeals for the District of

335   Columbia held that § 2614 imposes a strictly jurisdictional limitation, *Hardin v. City Title &*

336   *Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986),* while the Seventh Circuit came to the

337   opposite conclusion. *Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1164 (7th*

338   *Cir. 1997).* District courts have largely come down on the side of the Seventh Circuit in holding

339   that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v.*

340   *Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co.,*

341   *700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988).* Importantly, the Ninth Circuit, as noted above, has

342   interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the

343   language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914.* While not

344   of precedential value, this Court has previously found both the TILA and **RESPA** limitations

345   periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504*

346   *F.Supp.2d 1091,* (W.D. Wash. 2007). 1106-07.

ORIGINAL PETITION               12 of 22

347   The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay
348   by the Petitioner," and inquires whether "a reasonable Petitioner would ... have known of the
349   existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d*
350   *409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000).*
351   Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on
352   any wrongful conduct by the Defendants. Santa Maria. at 1178.

353   *BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING*
354   *STANDARDS*

355   Traditionally, Lenders required borrowers seeking mortgage loans to document their income and
356   assets by, for example, providing W-2 statements, tax returns, bank statements, documents
357   evidencing title, employment information, and other information and documentation that could
358   be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's
359   ability to repay a particular loan over both the short and long term. Defendants deviated from and
360   disregarded these standards, particularly with regard to its riskier and more profitable loan
361   products.

362   **Low-Documentation/No-Documentation Loans.**

363   Driven by its desire for market share and a perceived need to maintain competitiveness with the
364   likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no
365   documentation loan products, including the HARMs and HELOCs described hereinabove, and
366   began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to
367   the already eased underwriting standards to the point of disregarding such standards. This
368   quickened the loan origination process, allowing for the generation of more and more loans
369   which could then be resold and/or securitized in the secondary market.

370   Defendants marketed no-documentation/low-documentation loan programs that included
371   HARMs and HELOCs, among others, in which loans were given based on the borrower's "stated
372   income" or "stated assets" (SISA) neither of which were verified. Employment was verbally
373   confirmed, if at all, but not further investigated, and income, if it was even considered as a factor,
374   was to be roughly consistent with incomes in the types of jobs in which the borrower was
375   employed. When borrowers were requested to document their income, they were able to do so
376   through information that was less reliable than in a full-documentation loan.

377 For stated income loans, it became standard practice for loan processors, loan officers and
378 underwriters to rely on www.salary.com to see if a stated income was reasonable. Such stated
379 income loans, emphasizing loan origination from a profitability standpoint at the expense of
380 determining the ability of the borrower to repay the loan from an underwriting standpoint,
381 encouraged the overstating and/or fabrication of income.

382 **Easing of Underwriting Standards**

383 In order to produce more loans that could be resold in the secondary mortgage market,
384 Defendants also relaxed, and often disregarded, traditional underwriting standards used to
385 separate acceptable from unacceptable risk. Examples of such relaxed standards were reducing
386 the base FICO score needed for a SISA loan.

387 Other underwriting standards that Defendants relaxed included qualifying interest rates (the rate
388 used to determine whether borrowers can afford the loan), loan to value ratios (the amount of
389 loan(s) compared to the appraised/sale price of the property, whichever is lower), and debt-to-
390 income ratios (the amount of monthly income compared to monthly debt service payments and
391 other monthly payment obligations.

392 With respect to HARMS, Defendants underwrote loans without regard to the borrower's long-
393 term financial circumstances, approving the loan based on the initial fixed rate without taking
394 into account whether the borrower could afford the substantially higher payment that would
395 inevitably be required during the remaining term of the loan.

396 With respect to HELOCs, Defendants underwrote and approved such loans based only on the
397 borrower's ability to afford the interest-only payment during the initial draw period of the loan,
398 rather than on the borrower's ability to afford the subsequent, fully amortized principal and
399 interest payments.

400 As Defendants pushed to expand market share, they eased other basic underwriting standards.
401 For example, higher loan-to-value (LTV) and combined loan-to-value (CLTV) ratios were
402 allowed. Likewise, higher debt-to-income (DTI) ratios were allowed. At the same time that they
403 eased underwriting standards the Defendants also were encouraging consumers to go further into
404 debt in order to supply the very lucrative aftermarket of mortgage backed securities. The relaxed
405 underwriting standards created the aftermarket supply they needed. As a result, the Defendants
406 made it easy for the unwary consumer to take on more debt than he could afford by encouraging

ORIGINAL PETITION                                                                    14 of 22

407 unsound financial practices, all the while knowing defaults would occur more and more
408 frequently as the credit ratios of citizens reached the limit of the new relaxed underwriting
409 standards.

410 Defendants knew, or in the exercise of reasonable care should have known, from its own
411 underwriting guidelines industry standards that it was accumulating and selling/reselling risky
412 loans that were likely to end up in default. However, as the pressure mounted to increase market
413 share and originate more loans, Defendants began to grant "exceptions" even to its relaxed
414 underwriting guidelines. Such was the environment that loan officers and underwriters were,
415 from time to time, placed in the position of having to justify why they did not approve a loan that
416 failed to meet underwriting criteria.

417 **Risk Layering**

418 Defendants compromised its underwriting even further by risk layering, i.e. combining high risk
419 loans with one or more relaxed underwriting standards.

420 Defendants knew, or in the exercise of reasonable care should have known, that layered risk
421 would increase the likelihood of default. Among the risk layering Defendants engaged in were
422 approving HARM loans with little to no down payment, little to no documentation, and high
423 DTI/LTV/CLTV ratios. Despite such knowledge, Defendants combined these very risk factors in
424 the loans it promoted to borrowers.

425 Loan officers and mortgage Agents aided and abetted this scheme by working closely with other
426 mortgage Lenders/mortgage bankers to increase loan originations, knowing or having reason to
427 believe that Defendants and other mortgage Lenders/mortgage bankers with whom they did
428 business ignored basic established underwriting standards and acted to mislead the borrower, all
429 to the detriment of the borrower and the consumer of loan products..

430 Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them,
431 engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the
432 business practices described above in paragraphs 30-42 of this Complaint

433 *UNJUST ENRICHMENT*

434 Petitioner is informed and believes that each and all of the Defendants received a benefit at
435 Petitioner's expense, including but not limited to the following: To the Agent, commissions,
ORIGINAL PETITION                                                      15 of 22

436    yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to
437    be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums,
438    surcharges and other "back end" payments in amounts to be proved at trial; To the investors,
439    resale premiums, and high rates of return; To the servicers including EMS, servicing fees,
440    percentages of payment proceeds, charges, and other "back end" payments in amounts to be
441    proved at trial; To all participants, the expectation of future revenues from charges, penalties and
442    fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

443    By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants,
444    and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly
445    deprived, and is entitled to restitution in the amount of $75,000.

446    *CLAIM TO QUIET TITLE.*

447    Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and
448    the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title
449    interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission
450    and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

451    Defendants have no title, estate, lien, or interest in the Subject Property in that the purported
452    power of sale contained in the Deed of Trust is of no force or effect because Defendants' security
453    interest in the Subject Property has been rendered void and that the Defendants are not the holder
454    in due course of the Promissory Note. Moreover, because Petitioner properly pled all Defendants'
455    involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-conspirators,

456        "a Petitioner is entitled to damages from those Defendants who concur in the tortuous
457        scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co., 24 Cal.*
458        *3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, Inc.*
459        *v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d*
460        *27 (1st Dist. 2006); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal.*
461        *Rptr. 2d 752 (2d Dist. 1995).*

462    *SUFFICIENCY OF PLEADING*

463    Petitioner has sufficiently pled that relief can be granted on each and every one of the
464    Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond
465    doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would

466  entitle Petitioner to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All
467  allegations of material fact in the complaint are taken as true and construed in the light most
468  favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

469  Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc.
470  8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal
471  theories, and seeks remedies to which Petitioner is entitled. *Balistreri v. Pacifica Police Dept., 901 F.2d*
472  *696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal
473  conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court
474  should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752* (9th Cir, 1994). Lastly,
475  Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of
476  their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore,
477  relief as requested herein should be granted.

478  **CAUSES OF ACTION**

479  ***BREACH OF FIDUCIARY DUTY***

480  Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary
481  duty of care with respect to the mortgage loan transactions and related title activities involving
482  the Trust Property.

483  Defendants breached their duties to Petitioner by, *inter alia,* the conduct described above. Such
484  breaches included, but were not limited to, ensuring their own and Petitioners' compliance with
485  all applicable laws governing the loan transactions in which they were involved, including but
486  not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

487  Defendant's breaches of said duties were a direct and proximate cause of economic and non-
488  economic harm and detriment to Petitioner(s).

489  Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct,
490  all to be shown according to proof at trial of this matter.

491  ***CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE***

492  Defendants owed a general duty of care with respect to Petitioners, particularly concerning their
493  duty to properly perform due diligence as to the loans and related transactional issues described
494  hereinabove.

495    In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations
496    X and Z promulgated there under to, among other things, provide proper disclosures concerning
497    the terms and conditions of the loans they marketed, to refrain from marketing loans they knew
498    or should have known that borrowers could not afford or maintain, and to avoid paying undue
499    compensation such as "yield spread premiums" to mortgage Agents and loan officers.

500    Defendants knew or in the exercise of reasonable care should have known, that the loan
501    transactions involving Petitioner and other persons similarly situated were defective, unlawful,
502    violative of federal and state laws and regulations, and would subject Petitioner to economic and
503    non-economic harm and other detriment.

504    Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and
505    Z promulgated there under were intended and designed to protect, and the conduct alleged
506    against Defendants is the type of conduct and harm which the referenced statutes and regulations
507    were designed to deter.

508    As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and
509    non-economic harm in an amount to be shown according to proof at trial.

510    *AGENT: COMMON LAW FRAUD*

511    If any Agents' misrepresentations made herein were not intentional, said misrepresentations were
512    negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable
513    ground for believing them to be true.

514    Agents made these representations with the intention of inducing Petitioner to act in reliance on
515    these representations in the manner hereafter alleged, or with the expectation that Petitioner
516    would so act.

517    Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents
518    in their negligent misrepresentation, and that various Agents were negligent in not implementing
519    procedures such as underwriting standards oversight that would have prevented various Agents
520    from facilitating the irresponsible and wrongful misrepresentations of various Agents to
521    Defendants.

522 Petitioner is informed and believes that Agent acted in concert and collusion with others named
523 herein in promulgating false representations to cause Petitioner to enter into the LOAN without
524 knowledge or understanding of the terms thereof.

525 As a proximate result of the negligent misrepresentations of Agents as herein alleged, the
526 Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of
527 opportunities, attorney fees and costs, and other damages to be determined at trial. As a
528 proximate result of Agents' breach of duty and all other actions as alleged herein, Defendants has
529 suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and
530 mental and physical pain and anguish, all to Petitioner's damage in an amount to be established
531 at trial.

## 532 *PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED*
## 533 *COVENANT OF GOOD FAITH AND FAIR DEALING.*

534 Petitioner properly pled Defendants violated the breach of implied covenant of good faith and
535 fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its
536 performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261*
537 *Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v.*
538 *Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v*
539 *Jones, (2004) 33 Cal. 4th 917,* the court stated:

540 In the area of insurance contracts the covenant of good faith and fair dealing has taken on a
541 particular significance, in part because of the special relationship between the insurer and the
542 insured. The insurer, when determining whether to settle a claim, must give at least as much
543 consideration to the welfare of its insured as it gives to its own interests. . . The standard is
544 premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

545 Likewise, there is a special relationship between an Agent and borrower. "A person who
546 provides Agency services to a borrower in a covered loan transaction by soliciting Lenders or
547 otherwise negotiating a consumer loan secured by real property, is the fiduciary of the
548 consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the Agent may
549 be acting as an Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in
550 *good faith.* If the *Agent knew or should have known that the Borrower will or has a likelihood of*
551 *defaulting ... they have a fiduciary duty to the borrower not* to place them in that loan."

ORIGINAL PETITION                                                                19 of 22

552 (California Department of Real Estate, *Section 8: Fiduciary Responsibility*, www.dre.ca.gov).
553 [*Emphasis Added*].

554 All Defendants, willfully breached their implied covenant of good faith and fair dealing with
555 Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to
556 provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan
557 product without regard for other more affordable products; (4) Placed Petitioner into a loan
558 without following proper underwriting standards; (5) Failed to disclose to Petitioner that
559 Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform
560 valid and /or properly documented substitutions and assignments so that Petitioner could
561 ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's
562 request for documentation of the servicing of Petitioner's loan and the existence and content of
563 relevant documents. Additionally, Defendants breached their implied covenant of good faith and
564 fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the
565 right under an alleged power of sale because the purported assignment was not recorded and by
566 willfully and knowingly financially profiting from their malfeasance. Therefore, due to the
567 special relationship inherent in a real estate transaction between Agent and borrower, *and* all
568 Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

569 *CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET*
570 *SEQ*

571 Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation
572 contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of
573 Action as though the same were set forth herein.

574 Petitioner is informed and believes that Defendant's violation of the provisions of law rendered
575 the credit transaction null and void, invalidates Defendant's claimed interest in the Subject
576 Property, and entitles Petitioner to damages as proven at trial.

577 *INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

578 The conduct committed by Defendants, driven as it was by profit at the expense of increasingly
579 highly leveraged and vulnerable consumers who placed their faith and trust in the superior
580 knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by
581 civilized society.

ORIGINAL PETITION                                                     20 of 22

582 Defendants either knew that their conduct would cause Petitioner to suffer severe emotional
583 distress, or acted in conscious and/or reckless disregard of the probability that such distress
584 would occur.

585 Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the
586 conduct of Defendants as described hereinabove.

587 As a result of such severe emotional distress, Petitioner suffered economic and non economic
588 harm and detriment, all to be shown according to proof at trial of this matter.

589 Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by
590 Petitioner and secure to Petitioner quite title;

591 Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner
592 as payments to Defendants based on the fraudulently secured promissory note in an amount to be
593 calculated by Defendants and verified to Petitioner;

594 Petitioner further demands that Defendants pay to Petitioner an amount equal to treble the
595 amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be
596 equal to $225,000.00

597                                    **PRAYER**

598 WHEREFORE, Petitioner prays for judgment against the named Defendants, and each of them,
599 as follows:

600       For an emergency restraining order enjoining lender and any successor in interest from
601       foreclosing on Petitioner's Property pending adjudication of Petitioner's claims set forth
602       herein;

603       For a permanent injunction enjoining Defendants from engaging in the fraudulent,
604       deceptive, predatory and negligent acts and practices alleged herein;

605       For quiet title to Property;

606       For rescission of the loan contract and restitution by Defendants to Petitioner according
607       to proof at trial;

608       For disgorgement of all amounts wrongfully acquired by Defendants according to proof
609       at trial;

610       For actual monetary damages in the amount $75,000.00

ORIGINAL PETITION                                         21 of 22

611       For pain and suffering due to extreme mental anguish in an amount to be determined at
612       trial.

613       For pre-judgment and post-judgment interest according to proof at trial;

614       For punitive damages according to proof at trial in an amount equal to $225,000.00 .

615       For attorney's fees and costs as provided by statute; and,

616       For such other relief as the Court deems just and proper.

617   **Respectfully Submitted,**
618
619   _Richard Hartzell_      _Mary Hartzell_
620   Richard Hartzell      Mary Hartzell

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Richard & Mary Hartzell 4298 Ne 29½ St Redmond Orc 97756 | US Bank NA 4325 17th Ave SW Fargo ND 58103 |

(b) County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☒ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 USC 1601, 12 USC 2601, TILA / RESPA / HOLPA - Fraud, Et. Al.

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE 8/2/2010

SIGNATURE OF ATTORNEY OF RECORD Mary Hartzell

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# WestlawNext

**Hartzell v. US Bank NA**
United States District Court, D. Oregon, Eugene Division.    2010 WL 4641707    November 5, 2010    Slip Copy
Only the Westlaw citation is currently available.

Return to list        3 of 20 results        United States District Court,

D. Oregon,

Eugene Division.

## Richard and Mary **HARTZELL**, Plaintiffs,

v.

## **US BANK** NA, Defendant.

No. 10-6231-HO.    Nov. 5, 2010.

### Attorneys and Law Firms

Richard **Hartzell**, Redmond, OR, pro se.

Mary **Hartzell**, Redmond, OR, pro se.

William L. Larkins, Jr., Cody B. Hoesly, Larkins & Vacura LLP, Portland, OR, for Defendant.

### Opinion

#### ORDER

MICHAEL HOGAN, District Judge.

#### INTRODUCTION

\*1 On August 2, 2010, plaintiffs Richard and Mary **Hartzell** filed a *pro se* complaint against the **U.S. Bank** National Association (**U.S. Bank**). [# 1]. The complaint alleges that, in refinancing a residential property located at 2511 NE Yucca Ave, Redmond, Oregon 97756 (subject property), defendants "induced plaintiffs to enter into a predatory loan agreement", "committed numerous acts of fraud," "failed to make proper notices" that would have warned plaintiffs of these tactics and "charged false fees." [# 1-p.1].

Hartzell v. US Bank NA - WestlawNext                                    Page 2 of 5
Case 1:10-cv-03121-PA   Document 13-4   Filed 02/04/11   Page 26 of 29   Page ID#:
148

Defendant **U.S. Bank** moves to dismiss plaintiff's complaint or in the alternative for a more definite statement. [# 3].

### BACKGROUND

Plaintiffs Richard and Mary **Hartzell** have two virtually identical cases before this court [10-6230-HO & 10-6231-HO), involving allegations of mortgage fraud in refinancing of two residential properties[1]. This case involves a residence at 2511 NE Yucca Ave, Redmond OR 97756 for which plaintiffs, at an unknown time, "entered into a consumer contract for the refinance" with **U.S. Bank**. [# 1]

Plaintiffs allege "[d]efendants have concocted a carefully crafted connivance wherein Lender conspired with Agents, et al, to strip Petitioner of Petitioner's equity in the property by inducing Plaintiff to enter into a predatory" inflated loan product; and assert multiple claims[2] against defendant seeking temporary and permanent injunctions; quiet title to their property; rescission of the loan contract and restitution and disgorgement as well as economic damages of $75,000.00; undisclosed non-economic damages and punitive damages of $225,000.00. [# 1].

Defendant moves to dismiss or alternatively to require a more definite statement. [# 3]. Defendant notes multiple discrepancies in the pleadings and surmises that the complaint has been "cribbed from some other document." [# 4-p.2]. Defendants complain that while plaintiffs offer a "birds-eye view of the home lending market" and "how plaintiffs believed the markets functioned," their claims are insufficient to inform **U.S. Bank** what it allegedly did wrong or when and therefore should be dismissed, because it violates Fed.R.Civ.P. 8 and 12. [# 4-pp.2-3].

### DISCUSSION

#### 1. Fed, R.Civ.P. 8 and 12 Standards:

#### a) Fed.R.Civ.P. 8:

Claims for relief must contain a "short and plain statement of the claim showing the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Furthermore, "each allegation must be simple, concise and direct" showing the pleader is entitled to relief. Fed.R.Civ.P. 8 (d)(1); *Ashcroft v. Iqbal*, 129 S.Ct 1937, 1949 (2009). Under notice pleading in federal court, the complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell-Atlantic v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted).

#### b) Fed.R.Civ.P. 12(b)(6):

Dismissal under Fed.R.Civ.P. 12(b)(6) is appropriate where the complaint lacks sufficient facts to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*,

901 F.2d 696, 699 (9th Cir1988). To sufficiently state a claim for relief and survive a Fed.R.Civ.P. 12(b)(6) motion, the pleading does not need detailed factual allegations but the factual allegations must be enough to raise a right to relief above the speculative level. *Bell Atlantic,* 550 U.S. at 555 (mere labels and conclusions or a formulaic recitation of the elements of a cause of action will not do).

**\*2** There must be enough facts to state a claim for relief that is plausible on its face. *Id.* at 570. In other words, for a complaint to survive a motion to dismiss, the non-conclusory factual content and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the Plaintiff to relief. *Moss v. U.S. Secret Service,* 572 F.3d 962, 969 (9th Cir2009)

While this standard applies to pleadings no matter who drafts them, when reviewing the sufficiency of a complaint drafted by a *pro se* litigant, the pleadings are liberally construed and viewed less stringently than formal pleadings drafted by attorneys. *Erikson v. Pardus,* 551 U.S. 89, 94 (2007). Nevertheless, even *pro se* pleadings must meet a minimum threshold and provide the defendant with notice of what it is that it allegedly did wrong. *Brazil v. U.S. Dep't of Navy,* 66 F.3d 193, 199 (9th Cir.1995).

### 2. Plaintiffs' various claims:

Plaintiffs have generally alleged a variety of causes of action against the defendant **U.S. Bank.** However, none of plaintiffs' claims give any specifics about the alleged acts that **U.S. Bank** has committed. Instead, plaintiffs make general assertions about the mortgage industry and the problems they allege this industry visits on unsuspecting consumers.

Plaintiffs' response to defendant's motion to dismiss does buttress their complaint somewhat in that Exhibit 1, the settlement statement for the loan on the subject property, indicates that **U.S. Bank** is the lender, gives the loan amount and number as well as the settlement date of October 4, 2007,-none of which was supplied in the complaint. [# 6-Ex.1]. Generally, construing the complaint liberally, it appears that plaintiffs refinanced the subject property with **U.S. Bank** and that there now is some issue, presumably a default that the lender might seek to cure with a foreclosure sale on the property. [# 1-p.20].

### a) *Real Estate Settlement Procedures Act (RESPA) claims:*

Congress enacted RESPA to control real estate settlement costs by insuring "that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country." 12 U.S.C. § 2601(a). RESPA therefore

requires advance disclosure of settlement costs, the elimination of kickbacks or referral fees and a reduction in the amount buyers are required to place in. escrow accounts for taxes and insurance. 12 U.S.C. § 2601(b).

Plaintiffs' Complaint appears to base their claims on alleged violations of the Real Estate Settlement Procedures Act(RESPA). Plaintiffs allege *inter alia* that defendant breached its fiduciary duty by failing to ensure "their own and petitioner's compliance with all applicable laws" and being negligent in lending plaintiffs money they "knew or should have known that borrowers could not afford or maintain, and to avoid paying undue compensation such as 'yield spread premiums' to mortgage agents and loan officers ." [# 1-pp.17-18]. Plaintiffs' appear to further support their RESPA claims by arguing that defendant 'charged false fees" and "failed to provide documentation to establish that said fees were not included in those fees expressly addressed by the Real Estate Settlement Procedures Act as forbidden to be charged to Plaintiff at settlement." [# 6-p.1] Plaintiffs do not however, supply any specific details about those allegedly false fees.

*3 Defendants reply that plaintiffs have not cured the fatal problems with their RESPA claim(s) because:(1) there is no private right of action based on failure to disclose information; (2) plaintiffs do not claim to have made a qualified written request or claimed that **U.S. Bank** was a loan servicer and (3) that there are no allegations that any "undue compensation" received by "Agents and loan officers" was for services not performed. [# 4-pp.5-6; # 8-p.2]. I generally agree.

While some sections of RESPA do provide for a private right of action, others do not. *Cf* :12 U.S.C. § 2607 with § 2609; *see also Bloom v. Martin,* 865 F.Supp 1377 (*N.D.Cal.1994* ) (no private right of action for disclosure violations under 12 U.S.C. § 2603). However, plaintiffs complaint does not specify under which section of RESPA they assert claims nor does it specify what action by defendant allegedly breaches either a fiduciary duty to plaintiffs or is negligent.

Similarly plaintiffs' claim that "defendant, acting in concert and collusion with the loan broker" improperly provided the amounts listed in Exhibit 1 as "an undisclosed yield spread premium.". [[# 6-p.1]. This statement is directly contradicted by plaintiffs' exhibit which clearly states that the broker yield spread to 1st Rate Mortgage was $1,125.00. [# 6-Ex.1-1n 810].

In summary, plaintiffs' complaint fails to identify the alleged acts by **U.S. Bank** that violate their legal rights; what the conditions of their loan were; whether they defaulted on the loan, and if so when and why; what if anything, they may have done to attempt to remedy that default and what the lender's response if any, was to their

attempt(s). Also missing is any mention of whether plaintiffs have received notice from anyone that a foreclosure sale is contemplated and if so when it is scheduled.

## CONCLUSION

Based on the foregoing reasoning, defendant **U.S. Bank's** Motion to Dismiss [# 3] is GRANTED. This action is hereby dismissed without prejudice.

IT IS SO ORDERED.

---

**Footnotes**

1        Both subject properties are described by plaintiffs as "a primary residence," despite having two addresses.

2        Plaintiffs claims include: common law fraud; fraud in the inducement; fraud in the execution; fraud by non-disclosure; breach of fiduciary duty; negligence/negligence per se; negligent misrepresentation; breach of the implied covenant of good faith and fair dealing; unjust enrichment; intentional infliction of emotional distress; usury; criminal conspiracy; theft; and violation of the Federal Trade Commission Act, the Truth in Lending Act, the Real Estate Settlement Procedures Act and the Home ownership and Equity Protection Act.

---

**End of Document**        © 2011 Thomson Reuters. No claim to original U.S. Government Works.

Preferences      My Contacts      Getting Started      Help      Sign Off      WestlawNext. © 2011 Thomson Reuters
                                                                                Contact Us   1-800-REF-ATTY (1-800-

WestlawNext