# EXHIBIT E

1  Kathleen Magor
2  3002 Brinwood Ave
3  Austin TX 78704

FILED

4  UNITED STATES DISTRICT COURT
5  DISTRICT OF TEXAS

2010 JUN 29  PM 12: 30

Kathleen Magor

Plaintiff,

Case #  **A10CA 481SS**

vs.

**ORIGINAL PETITION**

GMAC Mortgage, LLC

Defendant

6

7                                                         Date: June 29, 2010

8  Comes now   Kathleen Magor , hereinafter referred to as "Petitioner," and moves

9  the court for relief as herein requested:

10                                            **PARTIES**

11  Petitioner is Kathleen Magor , 3002 Brinwood Ave Austin TX 78704.

12  Currently Known Defendant(s) are/is: GMAC Mortgage, LLC , PO Box 79135 , Phoenix , AZ

13  85062, by and through its attorney, , , , .

14                                    **STATEMENT OF CAUSE**

15  Petitioner, entered into a consumer contract for the refinance of a primary residence located at

16  3002 Brinwood Ave Austin TX 78704, hereinafter referred to as the "property."

17  Defendants, acting in concert and collusion with others, induced Petitioner to enter into a

18  predatory loan agreement with Defendant.

19  Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully

20  crafted scheme intended to defraud Petitioner.

21  Defendants failed to make proper notices to Petitioner that would have given Petitioner warning

22  of the types of tactics used by Defendants to defraud Petitioner.

23  Defendants charged false fees to Petitioner at settlement.

ORIGINAL PETITION                                                         1 of 24

24  Defendants used the above referenced false fees to compensate agents of Petitioner in order to
25  induce said agents to breach their fiduciary duty to Petitioner.

26  Defendant's attorney caused to be initiated collection procedures, knowing said collection
27  procedures in the instant action were frivolous as lender is estopped from collection procedures,
28  under authority of Uniform Commercial Code 3-501, subsequent to the request by Petitioner for
29  the production of the original promissory note alleged to create a debt.

30                                    **IN BRIEF**
31                          *(Non-factual Statement of Posture and Position)*

32  It is not the intent of Petitioner to indict the entire industry. It is just that Plaintiff will be
33  making a number of allegations that, outside the context of the current condition of the real
34  estate industry, may seem somewhat outrageous and counter-intuitive.

35  When Petitioner accuses ordinary individuals of acting in concert and collusion with an
36  ongoing criminal conspiracy, it tends to trigger an incredulous response as it is
37  unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary
38  people, just doing what they have been trained to do, are out to swindle the poor
39  unsuspecting borrower.

40  The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud
41  committed by people acting in concert and collusion, one with the other. Petitioner has no
42  reason to believe that the Agent, loan officer, appraiser, and others were consciously aware
43  that what they were doing was part of an ongoing criminal conspiracy, only that it was,
44  and they, at the very least, kept themselves negligently uninformed of the wrongs they
45  were perpetrating. Petitioner maintains the real culprit is the system itself, including the
46  courts, for failure to strictly enforce the consumer protection laws.

47                      **CAREFULLY CRAFTED CRIMINAL CONNIVANCE**
48                          *(General State of the Real Estate Industry)*

49  *THE BEST OF INTENTIONS*

50  Prior to the 1980's and 1990's ample government protections were in place to protect
51  consumers and the lending industry from precisely the disaster we now experience.
52  During President Clinton's administration, under the guise of making housing available to

53    the poor, primary protections were relaxed which had the effect of releasing the
54    unscrupulous on the unwary.

55    Prior to deregulation in the 1980's, lenders created loans for which they held and assumed
56    the risk. Consequently, Americans were engaged in safe and stable home mortgages.
57    With the protections removed, the unscrupulous lenders swooped in and, instead of
58    making loans available to the poor, used the opportunity to convince the unsophisticated
59    American public to do something that had been traditionally taboo; home buyers were
60    convinced to speculate with their homes, their most important investment.

61    GMAC Mortgage, LLC , Ameriquest, Countrywide, and many others swooped in and
62    convinced Americans to sell their homes, get out of their safe mortgage agreements, and
63    speculate with the equity they had gained by purchasing homes they could not afford.
64    Lenders created loans intended to fail as, under the newly crafted system, the Lender
65    profited more from a mortgage default than from a stable loan.

66    Companies cropped up who called themselves banks when, in fact, they were only either
67    subsidiaries of banks, or unaffiliated companies that were operated for the purpose of
68    creating and selling promissory notes. As will be demonstrated, these companies then
69    profited from the failure of the underlying loans.

70    *HOW IT WORKS*

71    Briefly, how it works is this, the Lender would secure a large loan from a large bank,
72    convert that loan into 20 and 30 year mortgages and then sell the promise to pay to an
73    investor.

74    People would set up mortgage companies buy securing a large loan from one of the major
75    banks, then convert that loan into 20 and 30 year mortgages. In order to accomplish this
76    an Agent would contract with a seller to find a buyer, bring both seller and buyer to a
77    lender who would secure the title from the seller using the borrowed bank funds for that
78    purpose, and then trade the title to the buyer in exchange for a promissory note.

79    The lender then creates a 20 or 30 year mortgage with money the lender must repay within
80    6 months. As soon as the closing is consummated, the promissory note is sold to an
81    investor pool.

82    Using the instant case as an example, a 170,450.00 note at 6.5604%% interest over 30
83    years will produce $164,781.92    The lender can then offer to the investor the security

ORIGINAL PETITION                                                              3 of 24

84   instrument (promissory note) at say 50% of it's future value. The investor will, over the
85   life of the note, less approximately 3.00% servicing fees, realize $192,957.71 . The lender
86   can then pay back the bank and retain a handsome profit in the amount of $34,443.24. The
87   lender, however, is not done with the deal.

88   The lender signed over the promissory note to the investor at the time of the trade, but did
89   not sign over the lien document (mortgage or deed of trust). The State of Kansas Supreme
90   Court addressed this issue and stated that such a transaction was certainly legal. However,
91   it created a fatal flaw as the holder of the lien document, at time of sale of the security
92   instrument, received consideration in excess of the lien amount. Since the lien holder
93   received consideration, he could not be harmed.     Therefore the lien became an
94   unenforceable document.

95   This begs the question: if keeping the lien would render it void, why would the lender not
96   simply transfer the lien with the promissory note? The reason is because the lender will
97   hold the lien for three years, file an Internal Revenue Service Form 1099a, claim the full
98   amount of the lien as abandoned funds, and deduct the full amount from the lender's tax
99   liability. The lender, by this maneuver, gets consideration a second time. And still the
100  lender is not done profiting from the deal.

101  After sale of the promissory note, the lender remains as the servicer for the investor. The
102  lender will receive 3% of each payment the lender collects and renders to the investor
103  pool. However, if the payment is late, the lender is allowed to assess an extra 5% and keep
104  that amount. Also, if the loan defaults, the lender stands to gain thousands for handling the
105  foreclosure.

106  The lender stands to profit more from a note that is overly expensive, than from a good
107  stable loan. And where, you may ask, does all this profit come from? It comes from the
108  equity the borrower had built up in the home. And still the lender is not finished profiting
109  from the deal.

110  Another nail was driven in the American financial coffin when on the last day Congress
111  was in session in 2000 when restrictions that had been in place since the economic
112  collapse of 1907 were removed.  Until 1907  investors were allowed to bet on stocks
113  without actually buying them.  This unbridled speculation led directly to an economic
114  collapse. As a result the legislature banned the practice, until the year 2000. In 2000 the
115  unscrupulous lenders got their way on the last day of the congressional session. Congress

ORIGINAL PETITION                                                                    4 of 24

116   removed the restriction banning derivatives and again allowed the practice, this time

117   taking only 8 years to crash the stock market.  This practice allowed the lender to profit

118   further from the loan by betting on the failure of the security instrument he had just sold to

119   the unwary investor, thus furthering the purpose of the lender to profit from both the

120   borrower (consumer) and the investor.

121   The failure of so many loans recently resulted in a seven hundred and fifty billion dollar

122   bailout at the expense of the taxpayer.  The unsuspecting consumer was lulled into

123   accepting the pronouncements of the lenders, appraisers, underwriters, and trustees as all

124   were acting under the guise of government regulation and, therefore, the borrower had

125   reason to expect good and fair dealings from all.  Unfortunately, the regulations in place to

126   protect the consumer from just this kind of abuse were simply being ignored.

127   The loan origination fee from the HUD1 settlement statement is the finder's fee paid for

128   the referral of the client to the lender by a person acting as an agent for the borrower.

129   Hereinafter, the person or entity who receives any portion of the yield spread premium, or

130   a commission of any kind consequent to securing the loan agreement through from the

131   borrower will be referred to as "Agent."  The fee, authorized by the consumer protection

132   law is restricted to 1% of the principal of the note.  It was intended that the Agent, when

133   seeking out a lender for the borrower, would seek the best deal for his client rather than

134   who would pay him the most.  That was the intent, but not the reality.  The reality is that

135   Agents never come away from the table with less than 2% or 3% of the principal.  This is

136   accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his

137   fiduciary duty to the borrower and convince the borrower to accept a more expensive loan

138   product than the borrower qualifies for.  This will generate more profits for the lender and,

139   consequently, for the Agent.

140   It is a common practice for lenders to coerce appraisers to give a higher appraisal than is

141   the fair market price.  This allows the lender to increase the cost of the loan product and

142   give the impression that the borrower is justified in making the purchase.

143   The lender then charges the borrower an underwriting fee in order to convince the

144   borrower that someone with knowledge has gone over the conditions of the note and

145   certified that they meet all legal criteria. The trustee, at closing, participates actively in the

146   deception of the borrower by placing undue stress on the borrower to sign the large stack

147   of paperwork without reading it.  The trustee is, after all, to be trusted and has been paid to

148    insure the transaction. This trust is systematically violated for the purpose of taking unfair
149    advantage of the borrower. The entire loan process is a carefully crafted contrive
150    connivance designed and intended to induce the unsophisticated borrower into accepting a
151    loan product that is beyond the borrowers means to repay. With all this, it should be a
152    surprise to no one that this country is having a real estate crisis.

153                    **PETITIONER WILL PROVE THE FOLLOWING**

154    Petitioner is prepared to prove, by a preponderance of evidence that:

155    • Lender has no legal standing to bring collection or foreclosure claims against the
156       property;

157    • Lender is not a real party in interest in any contract which can claim a collateral
158       interest in the property;

159    • even if Lender were to prove up a contract to which Lender had standing to enforce
160       against Petitioner, no valid lien exists which would give Lender a claim against the
161       property;

162    • even if Lender were to prove up a contract to which Lender had standing to enforce
163       against Petitioner, said contract was fraudulent in its creation as endorsement was
164       secured by acts of negligence, common law fraud, fraud by non-disclosure, fraud in
165       the inducement, fraud in the execution, usury, and breaches of contractual and
166       fiduciary obligations by Mortgagee or "Trustee" on the Deed of Trust, "Mortgage
167       Agents," "Loan Originators," "Loan Seller," "Mortgage Aggregator," "Trustee of
168       Pooled Assets," "Trustee or officers of Structured Investment Vehicle,"
169       "Investment Banker," "Trustee of Special Purpose Vehicle/Issuer of Certificates of
170       'Asset-Backed Certificates,'" "Seller of 'Asset-Backed' Certificates (shares or
171       bonds)," "Special Servicer" and Trustee, respectively, of certain mortgage loans
172       pooled together in a trust fund;

173    • Defendants have concocted a carefully crafted connivance wherein Lender
174       conspired with Agents, et al, to strip Petitioner of Petitioner's equity in the property
175       by inducing Plaintiff to enter into a predatory loan inflated loan product;

176    • Lender received unjust enrichment in the amount of 5% of each payment made late
177       to Lender while Lender and Lender's assigns acted as servicer of the note;

178    • Lender and Lender's assigns, who acted as servicer in place of Lender, profited by
179      handling the foreclosure process on a contract Lender designed to have a high
180      probability of default;

181    • Lender intended to defraud Investor by converting the promissory note into a
182      security instrument and selling same to Investor;

183    • Lender intended to defraud Investor and the taxpayers of the United States by
184      withholding the lien document from the sale of the promissory note in order that
185      Lender could then hold the lien for three years, then prepare and file Internal
186      Revenue Form 1099a and falsely claim the full lien amount as abandoned funds
187      and deduct same from Lender's income tax obligation;

188    • Lender defrauded backers of derivatives by betting on the failure of the promissory
189      note the lender designed to default;

190    • participant Defendants, et al, in the securitization scheme described herein have
191      devised business plans to reap millions of dollars in profits at the expense of
192      Petitioner and others similarly situated.

193                          **PETITIONER SEEKS REMEDY**

194    In addition to seeking compensatory, consequential and other damages, Petitioner seeks
195    declaratory relief as to what (if any) party, entity or individual or group thereof is the
196    owner of the promissory note executed at the time of the loan closing, and whether the
197    Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory
198    Injunction requiring re-conveyance of the subject property to the Petitioner or, in the
199    alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

200    *PETITIONER HAS BEEN HARMED*

201    Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

202    Such harm and detriment includes economic and non-economic damages, and injuries to
203    Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

204    In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the
205    equitable relief requested herein is granted.

206                          **STATEMENT OF CLAIM**

207        *DEFENDANTS LACK STANDING*

208            **No evidence of Contractual Obligation**

209    Defendants claim a controversy based on a contractual violation by Petitioner but have failed to
210    produce said contract. Even if Defendants produced evidence of the existence of said contract in
211    the form of an allegedly accurate photocopy of said document, a copy is only hearsay evidence
212    that a contract actually existed at one point in time. A copy, considering the present state of
213    technology, could be easily altered. As Lender only created one original and that original was
214    left in the custody of Lender, it was imperative that Lender protect said instrument.

215    In as much as the Lender is required to present the original on demand of Petitioner, there can be
216    no presumption of regularity when the original is not so produced. In as much as Lender has
217    refused Petitioner's request of the chain of custody of the security instrument in question by
218    refusing to identify all current and past real parties in interest, there is no way to follow said
219    chain of custody to insure, by verified testimony, that no alterations to the original provisions in
220    the contract have been made.      Therefore, the alleged copy of the original is only hearsay
221    evidence that an original document at one time existed. Petitioner maintains that, absent
222    production of admissible evidence of a contractual obligation on the part of Petitioner,
223    Defendants are without standing to invoke the subject matter jurisdiction of the court.

224            **No Proper Evidence of Agency**

225    Defendants claim agency to represent the principal in a contractual agreement involving
226    Petitioner, however, Defendants have failed to provide any evidence of said agency other than a
227    pronouncement that agency has been assigned by some person, the true identity and capacity of
228    whom has not been established. Defendants can hardly claim to be agents of a principal then
229    refuse to identify said principal. All claims of agency are made from the mouth of the agent with
230    no attempt to provide admissible evidence from the principal.

231    Absent proof of agency, Defendants lack standing to invoke the subject matter jurisdiction of the
232    court.

233    **Special Purpose Vehicle**

234    Since the entity now claiming agency to represent the holder of the security instrument is not the
235    original lender, Petitioner has reason to believe that the promissory note, upon consummation of
236    the contract, was converted to a security and sold into a special purpose vehicle and now resides
237    in a Real Estate Mortgage Investment Conduit (REMIC)    as defined by the Internal Revenue
238    Code and as such, cannot be removed from the REMIC as such would be a prohibited
239    transaction.    If the mortgage was part of a special purpose vehicle and was removed on
240    consideration of foreclosure, the real party in interest would necessarily be the trustee of the
241    special purpose vehicle. Nothing in the pleadings of Defendants indicates the existence of a
242    special purpose vehicle, and the lack of a proper chain of custody documentation gives Petitioner
243    cause to believe defendant is not the proper agent of the real party in interest.

244    *CRIMINAL CONSPIRACY AND THEFT*

245    Defendants, by and through Defendant's Agents, conspired with other Defendants, et al, toward
246    a criminal conspiracy to defraud Petitioner. Said conspiracy but are not limited to acts of
247    negligence, breach of fiduciary duty, common law fraud, fraud by non-disclosure, and tortuous
248    acts of conspiracy and theft, to include but not limited to, the assessment of improper fees to
249    Petitioner by Lender, which were then used to fund the improper payment of commission fees to
250    Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

251    *AGENT PRACTICED UP-SELLING*

252    By and through the above alleged conspiracy, Agent practiced up-selling to Petitioner. In so
253    doing, Agent violated the trust relationship actively cultivated by Agent and supported by fact
254    that Agent was licensed by the state. Agent further defrauded Petitioner by failing to disclose
255    Agent's conspiratorial relationship to Lender,    Agent violated Agent's fiduciary duty to
256    Petitioner and the duty to provide fair and honest services, through a series of carefully crafted
257    connivances, wherein Agent proactively made knowingly false and misleading statements of
258    alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead
259    Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of
260    a loan product offered by the Lender. Said loan product was more expensive than Petitioner
261    could legally afford. Agent acted with full knowledge that Petitioner would have made a
262    different decision had Agent given complete disclosure.

263 ### *FRAUDULENT INDUCEMENT*

264 Lender maliciously induced Petitioner to accept a loan product, Lender knew, or should have
265 known, Petitioner could not afford in order to unjustly enrich Lender.

266 ### *EXTRA PROFIT ON SALE OF PREDATORY LOAN PRODUCT*

267 Said more expensive loan product was calculated to produce a higher return when sold as a
268 security to an investor who was already waiting to purchase the loan as soon as it could be
269 consummated.

270 **Extra Commission for Late Payments**

271 Lender acted with deliberate malice in order to induce Petitioner to enter into a loan agreement
272 that Lender intended Petitioner would have difficulty paying. The industry standard payment to
273 the servicer for servicing a mortgage note is 3% of the amount collected. However, if the
274 borrower is late on payments, a 5% late fee is added and this fee is retained by the servicer.
275 Thereby, the Lender stands to receive more than double the regular commission on collections if
276 the borrower pays late.

277 **Extra Income for Handling Foreclosure**

278 Lender acted with deliberate malice in order to induce petitioner to enter into a loan agreement
279 on which Lender intended petitioner to default. In case of default, the Lender, acting as servicer,
280 receives considerable funds for handling and executing the foreclosure process.

281 **Credit Default Swap Gambling**

282 Lender, after deliberately creating a loan intended to default is now in a position to bet on credit
283 default swap, commonly referred to as a derivative as addressed more fully below. Since Lender
284 designed the loan to fail, betting on said failure is essentially a sure thing.

285 ### *LENDER ATTEMPTING TO FRAUDULENTLY COLLECT ON VOID LIEN.*

286 Lender sold the security instrument after closing and received consideration in an amount in
287 excess of the lien held by Lender. Since Lender retained the lien document upon the sale of the
288 security instrument, Lender separated the lien from said security instrument, creating a fatal and
289 irreparable flaw.

290    When Lender received consideration while still holding the lien and said consideration was in
291    excess of the amount of the lien, Lender was in a position such that he could not be harmed and
292    could not gain standing to enforce the lien. The lien was, thereby, rendered void.

293    Since the separation of the lien from the security instrument creates such a considerable concern,
294    said separation certainly begs a question: "Why would the Lender retain the lien when selling the
295    security instrument?"

296    When you follow the money the answer is clear. The Lender will hold the lien for three years,
297    then file an IRS Form 1099a and claim the full amount of the lien as abandoned funds and deduct
298    the full amount from Lender's tax liability, thereby, receiving consideration a second time.

299    Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the
300    lien to the holder of the security, however, the lien once satisfied, does not gain authority just
301    because the holder, after receiving consideration, decides to transfer it to someone else.

302    *LENDER PROFIT BY CREDIT DEFAULT SWAP DERIVATIVES*

303    Lender further stood to profit by credit default swaps in the derivatives market, by way of inside
304    information that Lender had as a result of creating the faulty loans sure to default. Lender was
305    then free to invest on the bet that said loan would default and stood to receive unjust enrichment
306    a third time. This credit default swap derivative market scheme is almost totally responsible for
307    the stock market disaster we now experience as it was responsible for the stock market crash in
308    1907.

309    *LENDER CHARGED FALSE FEES*

310    Lender charged fees to Petitioner that were in violation of the limitations imposed by the Real
311    Estate Settlement Procedures Act as said fees were simply contrived and not paid to a third party
312    vendor.

313    Lender charged other fees that were a normal part of doing business and should have been
314    included in the finance charge.

315    Below is a listing of the fees charged at settlement. Neither at settlement, nor at any other time
316    did Lender or Trustee provide documentation to show that the fees herein listed were valid,
317    necessary, reasonable, and proper to charge Petitioner.

ORIGINAL PETITION                                                    11 of 24

Case 1:10-cv-03121-PA Document 13-5 Filed 02/04/11 Page 13 of 31 Page ID#:
Case 1:10-cv-00461-SS Document 1 Filed 06/29/10 Page 12 of 24
164

| 803 | Appraisal | $196.00 |
| 804 | Messenger Mail | $60.50 |
| 808 | Broker Origination Fee | $1,704.50 |
| 809 | Broker Processing Fee | $450.00 |
| 901 | Interest | $1,125.00 |
| 1004 | County Property Taxes | $465.04 |
| 1006 | Tax certificates | $42.31 |
| 1107 | Attorney Fee | $50.00 |
| 1108 | Title Fee | $1,318.20 |
| 1109 | Escrow Fee | $2,000.00 |
| 1112 | Texas Policy Guarantee Fee | $1.00 |
| 1201 | Recording Fee | $148.00 |

318    Debtor is unable to determine whether or not the above fees are valid in accordance with the
319    restrictions provided by the various consumer protection laws. Therefore, please provide; a
320    complete billing from each vendor who provided the above listed services; the complete contact
321    information for each vendor who provided a billed service; clearly stipulate as to the specific
322    service performed; a showing that said service was necessary; a showing that the cost of said
323    service is reasonable; a showing of why said service is not a regular cost of doing business that
324    should rightly be included in the finance charge.

325    The above charges are hereby disputed and deemed unreasonable until such time as said charges
326    have been demonstrated to be reasonable, necessary, and in accordance with the limitations and
327    restrictions included in any and all laws, rules, and regulations intended to protect the consumer.

328    In the event lender fails to properly document the above charges, borrower will consider same as
329    false charges. The effect of the above amounts that borrower would pay over the life of the note
330    will be an overpayment of $62,619.03 This amount will be reduced by the amount of items
331    above when said items are fully documented.

332    *RESPA PENALTY*

333    From a cursory examination of the records, with the few available, the apparent RESPA
334    violations are as follows: Good Faith Estimate not within limits, No HUD-1 Booklet, Truth In
335    Lending Statement not within limits compared to Note, Truth in Lending Statement not timely
336    presented, HUD-1 not presented at least one day before closing, No Holder Rule Notice in Note,
337    No 1st Payment Letter.

338    The closing documents included no signed and dated : Financial Privacy Act Disclosure; Equal
339    Credit Reporting Act Disclosure; notice of right to receive appraisal report; servicing disclosure
340    statement; borrower's Certification of Authorization; notice of credit score; RESPA servicing

ORIGINAL PETITION                                                                                12 of 24

Case 1:10-cv-00489-SS Document 13-5 Filed 02/04/11 Page 14 of 31   Page ID#:
165
Case 1:10-cv-00489-SS Document 13-5 Filed 06/29/10 Page 13 of 24

341   disclosure letter; loan discount fee disclosure; business insurance company arrangement
342   disclosure; notice of right to rescind.

343   The courts have held that the borrower does not have to show harm to claim a violation of the
344   Real Estate Settlement Procedures Act, as the Act was intended to insure strict compliance. And,
345   in as much as the courts are directed to assess a penalty of no less than two hundred dollars and
346   no more than two thousand, considering the large number enumerated here, it is reasonable to
347   consider that the court will assess the maximum amount for each violation.

348   Since the courts have held that the penalty for a violation of RESPA accrues at consummation of
349   the note, borrower has calculated that, the number of violations found in a cursory examination
350   of the note, if deducted from the principal, would result in an overpayment on the part of the
351   borrower, over the life of the note, of $131,093.26.

352   If the violation penalty amounts for each of the unsupported fees listed above are included, the
353   amount by which the borrower would be defrauded is $169,691.20

354   Adding in RESPA penalties for all the unsupported settlement fees along with the TILA/Note
355   variance, it appears that lender intended to defraud borrower in the amount of $363,429.37

356   *LENDER CONSPIRED WITH APPRAISER*

357   Lender, in furtherance of the above referenced conspiracy, conspired with appraiser for the
358   purpose of preparing an appraisal with a falsely stated price, in violation of appraiser's fiduciary
359   duty to Petitioner and appraiser's duty to provide fair and honest services, for the purpose of
360   inducing Petitioner to enter into a loan product that was fraudulent toward the interests of
361   Petitioner.

362   *LENDER CONSPIRED WITH TRUSTEE*

363   Lender conspired with the trust Agent at closing to create a condition of stress for the specific
364   purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and
365   fully understand what was being signed.

366   The above referenced closing procedure was a carefully crafted connivance, designed and
367   intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty
368   to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner

369 did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure
370 as required by various consumer protection statutes.

371    *DECEPTIVE ADVERTISING AND OTHER UNFAIR BUSINESS PRACTICES*

372 In the manner in which Defendants have carried on their business enterprises, they have engaged
373 in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45* et seq.
374 (Deceptive Practices Act).

375 Such conduct comprises a pattern of business activity within the meaning of such statutes, and
376 has directly and proximately caused Petitioner to suffer economic and non-economic harm and
377 detriment in an amount to be shown according to proof at trial of this matter.

378    *EQUITABLE TOLLING FOR TILA AND RESPA*

379 The Limitations Period for Petitioners' Damages Claims under TILA and RESPA should be
380 Equitably Tolled due to the DEFENDANTS' Misrepresentations and Failure to Disclose.

381 Any claims for statutory and other money damages under the Truth in Lending Act *(15 U.S.C. §*
382 *1601*, et. seq.) and under the Real Estate Settlement Procedures Act *(12 U.S.C. § 2601* et. seq.)
383 are subject to a one-year limitations period; however, such claims are subject to the equitable
384 tolling doctrine. The Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as
385 subject to equitable tolling. In *King v. California, 784 F.2d 910 (9th Cir.1986),* the court held
386 that given the remedial purpose of TILA, the limitations period should run from the date of
387 consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate
388 circumstances, suspend the limitations period until the borrower discovers or has reasonable
389 opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King*
390 *v. California, 784 F.2d 910, 915 9t*h Cir. 1986).

391 Likewise, while the Ninth Circuit has not taken up the question whether *12 U.S.C. § 2614,* the
392 anti-kickback provision of **RESPA,** is subject to equitable tolling, other Courts have, and hold
393 that such limitations period may be equitably tolled. The Court of Appeals for the District of
394 Columbia held that § 2614 imposes a strictly jurisdictional limitation, *Hardin v. City Title &*
395 *Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986),* while the Seventh Circuit came to the
396 opposite conclusion. *Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1164 (7th*
397 *Cir. 1997).* District courts have largely come down on the side of the Seventh Circuit in holding

ORIGINAL PETITION                                                    14 of 24

398    that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v.*
399    *Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co.,*
400    *700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988)*. Importantly, the Ninth Circuit, as noted above, has
401    interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the
402    language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914*. While not
403    of precedential value, this Court has previously found both the TILA and **RESPA** limitations
404    periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504*
405    *F.Supp.2d 1091*, (W.D. Wash. 2007). 1106-07.

406    The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay
407    by the Petitioner," and inquires whether "a reasonable Petitioner would ... have known of the
408    existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d*
409    *409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000)*.
410    Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on
411    any wrongful conduct by the Defendants. Santa Maria. at 1178.

412    ### *BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING*
413    ### *STANDARDS*

414    Traditionally, Lenders required borrowers seeking mortgage loans to document their income and
415    assets by, for example, providing W-2 statements, tax returns, bank statements, documents
416    evidencing title, employment information, and other information and documentation that could
417    be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's
418    ability to repay a particular loan over both the short and long term. Defendants deviated from and
419    disregarded these standards, particularly with regard to its riskier and more profitable loan
420    products.

421    **Low-Documentation/No-Documentation Loans.**

422    Driven by its desire for market share and a perceived need to maintain competitiveness with the
423    likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no
424    documentation loan products, including the HARMs and HELOCs described hereinabove, and
425    began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to
426    the already eased underwriting standards to the point of disregarding such standards. This
427    quickened the loan origination process, allowing for the generation of more and more loans
428    which could then be resold and/or securitized in the secondary market.

ORIGINAL PETITION                                                         15 of 24

429    Defendants marketed no-documentation/low-documentation loan programs that included
430    HARMs and HELOCs, among others, in which loans were given based on the borrower's "stated
431    income" or "stated assets" (SISA) neither of which were verified. Employment was verbally
432    confirmed, if at all, but not further investigated, and income, if it was even considered as a factor,
433    was to be roughly consistent with incomes in the types of jobs in which the borrower was
434    employed. When borrowers were requested to document their income, they were able to do so
435    through information that was less reliable than in a full-documentation loan.

436    For stated income loans, it became standard practice for loan processors, loan officers and
437    underwriters to rely on www.salary.com to see if a stated income was reasonable. Such stated
438    income loans, emphasizing loan origination from a profitability standpoint at the expense of
439    determining the ability of the borrower to repay the loan from an underwriting standpoint,
440    encouraged the overstating and/or fabrication of income.

441    **Easing of Underwriting Standards**

442    In order to produce more loans that could be resold in the secondary mortgage market,
443    Defendants also relaxed, and often disregarded, traditional underwriting standards used to
444    separate acceptable from unacceptable risk. Examples of such relaxed standards were reducing
445    the base FICO score needed for a SISA loan.

446    Other underwriting standards that Defendants relaxed included qualifying interest rates (the rate
447    used to determine whether borrowers can afford the loan), loan to value ratios (the amount of
448    loan(s) compared to the appraised/sale price of the property, whichever is lower), and debt-to-
449    income ratios (the amount of monthly income compared to monthly debt service payments and
450    other monthly payment obligations.

451    With respect to HARMS, Defendants underwrote loans without regard to the borrower's long-
452    term financial circumstances, approving the loan based on the initial fixed rate without taking
453    into account whether the borrower could afford the substantially higher payment that would
454    inevitably be required during the remaining term of the loan.

455    With respect to HELOCs, Defendants underwrote and approved such loans based only on the
456    borrower's ability to afford the interest-only payment during the initial draw period of the loan,
457    rather than on the borrower's ability to afford the subsequent, fully amortized principal and
458    interest payments.

459    As Defendants pushed to expand market share, they eased other basic underwriting standards.
460    For example, higher loan-to-value (LTV) and combined loan-to-value (CLTV) ratios were
461    allowed. Likewise, higher debt-to-income (DTI) ratios were allowed. At the same time that they
462    eased underwriting standards the Defendants also were encouraging consumers to go further into
463    debt in order to supply the very lucrative aftermarket of mortgage backed securities. The relaxed
464    underwriting standards created the aftermarket supply they needed. As a result, the Defendants
465    made it easy for the unwary consumer to take on more debt than he could afford by encouraging
466    unsound financial practices, all the while knowing defaults would occur more and more
467    frequently as the credit ratios of citizens reached the limit of the new relaxed underwriting
468    standards.

469    Defendants knew, or in the exercise of reasonable care should have known, from its own
470    underwriting guidelines industry standards that it was accumulating and selling/reselling risky
471    loans that were likely to end up in default. However, as the pressure mounted to increase market
472    share and originate more loans, Defendants began to grant "exceptions" even to its relaxed
473    underwriting guidelines. Such was the environment that loan officers and underwriters were,
474    from time to time, placed in the position of having to justify why they did not approve a loan that
475    failed to meet underwriting criteria.

476    **Risk Layering**

477    Defendants compromised its underwriting even further by risk layering, i.e. combining high risk
478    loans with one or more relaxed underwriting standards.

479    Defendants knew, or in the exercise of reasonable care should have known, that layered risk
480    would increase the likelihood of default. Among the risk layering Defendants engaged in were
481    approving HARM loans with little to no down payment, little to no documentation, and high
482    DTI/LTV/CLTV ratios. Despite such knowledge, Defendants combined these very risk factors in
483    the loans it promoted to borrowers.

484    Loan officers and mortgage Agents aided and abetted this scheme by working closely with other
485    mortgage Lenders/mortgage bankers to increase loan originations, knowing or having reason to
486    believe that Defendants and other mortgage Lenders/mortgage bankers with whom they did
487    business ignored basic established underwriting standards and acted to mislead the borrower, all
488    to the detriment of the borrower and the consumer of loan products..

ORIGINAL PETITION                                                                    17 of 24

489 Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them,

490 engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the

491 business practices described above in paragraphs 30-42 of this Complaint

492 **UNJUST ENRICHMENT**

493 Petitioner is informed and believes that each and all of the Defendants received a benefit at

494 Petitioner's expense, including but not limited to the following: To the Agent, commissions,

495 yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to

496 be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums,

497 surcharges and other "back end" payments in amounts to be proved at trial; To the investors,

498 resale premiums, and high rates of return; To the servicers including EMS; servicing fees,

499 percentages of payment proceeds, charges, and other "back end" payments in amounts to be

500 proved at trial; To all participants, the expectation of future revenues from charges, penalties and

501 fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

502 By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants,

503 and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly

504 deprived, and is entitled to restitution in the amount of $363,429.37

505 **CLAIM TO QUIET TITLE.**

506 Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and

507 the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title

508 interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission

509 and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

510 Defendants have no title, estate, lien, or interest in the Subject Property in that the purported

511 power of sale contained in the Deed of Trust is of no force or effect because Defendants' security

512 interest in the Subject Property has been rendered void and that the Defendants are not the holder

513 in due course of the Promissory Note. Moreover, because Petitioner properly pled all Defendants'

514 involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-conspirators,

515 "a Petitioner is entitled to damages from those Defendants who concur in the tortuous

516 scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co., 24 Cal.*

517 *3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, Inc.*

518 *v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d*

ORIGINAL PETITION                                                                 18 of 24

Case 1:10-cv-03121-PA-Document 13-5 1 Filed 06/29/10 Page 20 of 31 Page ID#:
Case 1:10-cv-04051-SS Document 1 Filed 06/29/10 Page 20 of 24
171

519    *27 (1st Dist. 2006); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal.*
520    *Rptr. 2d 752 (2d Dist. 1995).*

521    ## SUFFICIENCY OF PLEADING

522    Petitioner has sufficiently pled that relief can be granted on each and every one of the
523    Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond
524    doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would
525    entitle Petitioner to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All
526    allegations of material fact in the complaint are taken as true and construed in the light most
527    favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

528    Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc.
529    8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal
530    theories, and seeks remedies to which Petitioner is entitled. *Balistreri v. Pacifica Police Dept., 901 F.2d*
531    *696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal
532    conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court
533    should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752* (9th Cir, 1994). Lastly,
534    Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of
535    their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore,
536    relief as requested herein should be granted.

537    ## CAUSES OF ACTION

538    ## BREACH OF FIDUCIARY DUTY

539    Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary
540    duty of care with respect to the mortgage loan transactions and related title activities involving
541    the Trust Property.

542    Defendants breached their duties to Petitioner by, *inter alia,* the conduct described above. Such
543    breaches included, but were not limited to, ensuring their own and Petitioners' compliance with
544    all applicable laws governing the loan transactions in which they were involved, including but
545    not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

546    Defendant's breaches of said duties were a direct and proximate cause of economic and non-
547    economic harm and detriment to Petitioner(s).

548    Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct,

549    all to be shown according to proof at trial of this matter.

550    *CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE*

551    Defendants owed a general duty of care with respect to Petitioners, particularly concerning their

552    duty to properly perform due diligence as to the loans and related transactional issues described

553    hereinabove.

554    In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations

555    X and Z promulgated there under to, among other things, provide proper disclosures concerning

556    the terms and conditions of the loans they marketed, to refrain from marketing loans they knew

557    or should have known that borrowers could not afford or maintain, and to avoid paying undue

558    compensation such as "yield spread premiums" to mortgage Agents and loan officers.

559    Defendants knew or in the exercise of reasonable care should have known, that the loan

560    transactions involving Petitioner and other persons similarly situated were defective, unlawful,

561    violative of federal and state laws and regulations, and would subject Petitioner to economic and

562    non-economic harm and other detriment.

563    Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and

564    Z promulgated there under were intended and designed to protect, and the conduct alleged

565    against Defendants is the type of conduct and harm which the referenced statutes and regulations

566    were designed to deter.

567    As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and

568    non-economic harm in an amount to be shown according to proof at trial.

569    *AGENT: COMMON LAW FRAUD*

570    If any Agents' misrepresentations made herein were not intentional, said misrepresentations were

571    negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable

572    ground for believing them to be true.

573    Agents made these representations with the intention of inducing Petitioner to act in reliance on

574    these representations in the manner hereafter alleged, or with the expectation that Petitioner

575    would so act.

576  Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents

577  in their negligent misrepresentation, and that various Agents were negligent in not implementing

578  procedures such as underwriting standards oversight that would have prevented various Agents

579  from facilitating the irresponsible and wrongful misrepresentations of various Agents to

580  Defendants.

581  Petitioner is informed and believes that Agent acted in concert and collusion with others named

582  herein in promulgating false representations to cause Petitioner to enter into the LOAN without

583  knowledge or understanding of the terms thereof.

584  As a proximate result of the negligent misrepresentations of Agents as herein alleged, the

585  Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of

586  opportunities, attorney fees and costs, and other damages to be determined at trial. As a

587  proximate result of Agents' breach of duty and all other actions as alleged herein, Defendants has

588  suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and

589  mental and physical pain and anguish, all to Petitioner's damage in an amount to be established

590  at trial.

591  *PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED*

592  *COVENANT OF GOOD FAITH AND FAIR DEALING.*

593  Petitioner properly pled Defendants violated the breach of implied covenant of good faith and

594  fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its

595  performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261*

596  *Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v.*

597  *Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v*

598  *Jones, (2004) 33 Cal. 4th 917,* the court stated:

599  In the area of insurance contracts the covenant of good faith and fair dealing has taken on a

600  particular significance, in part because of the special relationship between the insurer and the

601  insured. The insurer, when determining whether to settle a claim, must give at least as much

602  consideration to the welfare of its insured as it gives to its own interests. . . The standard is

603  premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

604  Likewise, there is a special relationship between an Agent and borrower. "A person who

605  provides Agency services to a borrower in a covered loan transaction by soliciting Lenders or

606 otherwise negotiating a consumer loan secured by real property, is the fiduciary of the
607 consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the Agent may
608 be acting as an Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in
609 *good faith*. If the *Agent knew or should have known that the Borrower will or has a likelihood of*
610 *defaulting ... they have a fiduciary duty to the borrower not* to place them in that loan."
611 (California Department of Real Estate, *Section 8: Fiduciary Responsibility*, www.dre.ca.gov).
612 [*Emphasis Added*].

613 All Defendants, willfully breached their implied covenant of good faith and fair dealing with
614 Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to
615 provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan
616 product without regard for other more affordable products; (4) Placed Petitioner into a loan
617 without following proper underwriting standards; (5) Failed to disclose to Petitioner that
618 Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform
619 valid and /or properly documented substitutions and assignments so that Petitioner could
620 ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's
621 request for documentation of the servicing of Petitioner's loan and the existence and content of
622 relevant documents. Additionally, Defendants breached their implied covenant of good faith and
623 fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the
624 right under an alleged power of sale because the purported assignment was not recorded and by
625 willfully and knowingly financially profiting from their malfeasance. Therefore, due to the
626 special relationship inherent in a real estate transaction between Agent and borrower, *and* all
627 Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

628 *CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET*
629 *SEQ*

630 Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation
631 contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of
632 Action as though the same were set forth herein.

633 Petitioner is informed and believes that Defendant's violation of the provisions of law rendered
634 the credit transaction null and void, invalidates Defendant's claimed interest in the Subject
635 Property, and entitles Petitioner to damages as proven at trial.

Case 1:10-cv-03121-RA Document 13-5 Filed 02/04/11 Page 24 of 31
Case 1:10-cv-00489-SS Document 1 Filed 06/29/10 Page 23 of 24   Page ID#:
175

636   *INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

637   The conduct committed by Defendants, driven as it was by profit at the expense of increasingly
638   highly leveraged and vulnerable consumers who placed their faith and trust in the superior
639   knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by
640   civilized society.

641   Defendants either knew that their conduct would cause Petitioner to suffer severe emotional
642   distress, or acted in conscious and/or reckless disregard of the probability that such distress
643   would occur.

644   Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the
645   conduct of Defendants as described hereinabove.

646   As a result of such severe emotional distress, Petitioner suffered economic and non economic
647   harm and detriment, all to be shown according to proof at trial of this matter.

648   Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by
649   Petitioner and secure to Petitioner quite title;

650   Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner
651   as payments to Defendants based on the fraudulently secured promissory note in an amount to be
652   calculated by Defendants and verified to Petitioner;

653   Petitioner further demands that Defendants pay to Petitioner an amount equal to treble the
654   amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be
655   equal to $1,090,288.11

656                                           **PRAYER**

657   WHEREFORE, Petitioner prays for judgment against the named Defendants, and each of them,
658   as follows:

659        For an emergency restraining order enjoining lender and any successor in interest from
660        foreclosing on Petitioner's Property pending adjudication of Petitioner's claims set forth
661        herein;

662        For a permanent injunction enjoining Defendants from engaging in the fraudulent,
663        deceptive, predatory and negligent acts and practices alleged herein;

664        For quiet title to Property;

ORIGINAL PETITION                                           23 of 24

Case 1:10-cv-03121-PA Document 13-5 Filed 02/04/11 Page 25 of 31 Page ID#:
Case 1:10-cv-00481-SS Document 1 Filed 06/29/10 Page 25 of 31
176

665   For rescission of the loan contract and restitution by Defendants to Petitioner according
666   to proof at trial;

667   For disgorgement of all amounts wrongfully acquired by Defendants according to proof
668   at trial;

669   For actual monetary damages in the amount $363,429.37;

670   For pain and suffering due to extreme mental anguish in an amount to be determined at
671   trial.

672   For pre-judgment and post-judgment interest according to proof at trial;

673   For punitive damages according to proof at trial in an amount equal to $1,090,288.11.

674   For attorney's fees and costs as provided by statute; and,

675   For such other relief as the Court deems just and proper.

676   **Respectfully Submitted,**
677
678   _Kathleen Magor_
679   Kathleen Magor
      (512) 440-1464

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2010 OCT -6 PM 1: 53

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____
                    DEPUTY

KATHLEEN A. MAGOR,
                          Plaintiff,

-vs-                                                    Case No. A-10-CA-481-SS

GMAC MORTGAGE, LLC,
                          Defendant.

## O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and

specifically Defendant GMAC Mortgage, LLC ("GMAC")'s Motion to Dismiss Plaintiff's

Complaint ("Mot. Dism.") [#7], Plaintiff Kathleen Magor ("Magor")'s reply ("Pl. Rep.") [#11]

thereto, and GMAC's response [#12]. After reviewing the motions, the relevant case law, and the

file as a whole, the Court now GRANTS GMAC's motion to dismiss.

Magor's complaint seems familiar to this Court; indeed, it bears an uncanny, almost word-

for-word resemblance to another such document filed in a different case.[1] Mercifully, this complaint

is only 24 pages long as compared to its sibling's 25, but the content—from its six page introduction

to its allegations of criminal conspiracy to its use of the admirably alliterative term "carefully crafted

criminal connivance"—is virtually identical.

---

[1] The case in question is A-10-CA-580-SS. The resemblance even extends to the complaint's unconventional
underlining scheme, which sometimes extends beyond a single sentence, but sometimes does not even span the entirety
of a single word. *See, e.g.,* Complaint [#1] at 3 ("the̲ir").

Case 1:10-cv-03121-PA    Document 13-5    Filed 02/04/11    Page 27 of 31    Page ID#:
178
Case 1:10-cv-00481-SS   Document 14    Filed 10/06/10   Page 2 of 6

The Court has an exceptionally busy docket and has neither the time nor inclination to deal with poorly written form pleadings. Thus, in the spirit of Magor's complaint, the Court will now likewise enter a nearly word-for-word copy of its Order of Dismissal from the other case:

Federal Rule of Civil Procedure 8(a)(2) states that a complaint must state "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Magor's complaint falls about as short of this standard as possible. The Court is willing to make some allowances in light of Magor's pro se status, but Magor's pleadings are beyond the pale. The complaint is 24 pages long. It takes Magor six pages to reach a statement of what she is prepared to prove. The Court specifically advises Magor to exclude this background information in future pleadings.

Unfortunately, the first six pages are not the only problem with this complaint. Magor's factual recitation, such as it is, runs afoul of both Rule 8(a)(2)'s directive and Supreme Court precedent. In order to survive a motion to dismiss, a plaintiff must plead sufficient facts to state a claim for relief that is plausible on its face; a claim is plausible on its face when the plaintiff pleads facts sufficient for the Court to draw a reasonable inference—more than just a "sheer possibility"—that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Magor's "facts" do not allow the Court to do so; in fact, Magor's factual allegations often do not even allow the Court to identify to whom she is referring. Magor's vague, scattershot allegations against "Lender," "Agent," "Lender's assigns," and "Defendants"—plural despite the single named defendant—do not provide sufficient clarity to satisfy Rule 8(a)(2), *Iqbal*, or this Court. Further, Magor appears to refer to herself variously as "Plaintiff," "Petitioner," and "Investor," sometimes changing between the two within a single paragraph or sentence. The Court

-2-

Case 1:10-cv-03121-PA   Document 13-5   Filed 02/04/11   Page 28 of 31   Page ID#:
179
Case 1:10-cv-00481-SS   Document 14   Filed 10/06/10   Page 3 of 6

advises Magor to be consistent when describing herself and specific when making allegations against others.

The Federal Rules of Civil Procedure require a heightened pleading standard for fraud: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED R. CIV. P. 9(b). Magor is cautioned that the Fifth Circuit "interprets Rule 9(b) strictly, requiring the plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009). As noted above, Magor's pleadings are insufficient to satisfy the relaxed Rule 8 pleading standard, much less the heightened pleading standard of Rule 9. Thus, the Court advises Magor to make specific factual allegations regarding GMAC's conduct throughout her complaint, and especially in areas where she is pleading fraudulent behavior.

As an example, one of Magor's "facts" is: "Defendants have concocted a carefully crafted connivance wherein Lender conspired with Agents, et al [sic], to strip Petitioner of Petitioner's equity in the property by inducing Plaintiff to enter into a predatory loan inflated loan product." Although the Court appreciates Magor's use of alliteration, its appreciation unfortunately ends there. This allegation does not identify any specific acts; does not include dates or names of agents who performed these acts on GMAC's behalf; does not identify what property is being referenced; and does not sufficiently identify the people who are named by the generic titles. The Court does not represent that these facts are all that are required for Magor to sufficiently plead her cause of action, but if Magor wishes her complaint to survive a motion to dismiss, this is the type of information she

-3-

Case 1:10-cv-03121-PA   Document 13-5   Filed 02/04/11   Page 29 of 31   Page ID#:
180
Case 1:10-cv-00481-SS   Document 14   Filed 10/06/10   Page 4 of 6

must provide for every factual allegation. The Court reiterates that *all* relevant facts must be pleaded with enough specificity to satisfy Rule 8 and *Iqbal*; to support allegations of fraud, Magor's facts must be pleaded with sufficient particularity to satisfy Rule 9(b)'s heightened standard.

Needless to say, Magor's "Statement of Claim" seriously concerns the Court. Magor starts with the remarkable assertion that "Defendants claim a controversy based on a contractual violation by Petitioner but have failed to produce said contract," and concludes with the equally surprising statement that, "Petitioner maintains . . . Defendants are without standing to invoke the subject matter jurisdiction of the court." Plaintiff's Original Complaint ("Compl.") [#1] at 8. The Court notes that, as the defendant, GMAC is not claiming any controversy; nor would they be likely to object if the Court refused to exercise subject matter jurisdiction over this case. Procedural niceties aside, this and other passages suggest to the Court that Magor has, as GMAC suggests, appropriated this pleading—perhaps with minor changes—from somebody else, for use before this Court. This conclusion is buttressed by the fact that almost every case cited in the document is from the Ninth Circuit.[2] It is further supported by the fact that the Court has read the exact words of Magor's complaint before. In her reply brief, Magor suggests her complaint is "similar" to other documents because GMAC is engaged in an ongoing criminal enterprise and this Court should convene a "court of inquiry" to examine GMAC's practices. The Court makes two notes here. First, Magor's characterization of her complaint as "similar" to others is akin to calling a Texas summer "warm"; both labels vastly understate the case. Second, the Court must decline Magor's invitation to convene a court of inquiry—charming as that sounds—because it is already overburdened with legitimate

---

[2] As Magor may be aware, the Western District of Texas resides in the Fifth Circuit and is not bound by Ninth Circuit law. Indeed, none of the cases cited in Magor's complaint appear to be binding on this Court.

Case 1:10-cv-03121-PA   Document 13-5   Filed 02/04/11   Page 30 of 31   Page ID#:
181
Case 1:10-cv-00481-SS   Document 14   Filed 10/06/10   Page 5 of 6

cases, to say nothing of those of more ambiguous merit. In short, if Magor paid for this complaint, she paid too much. But no matter how she came by it, her signature on page 24 makes her responsible for its contents. Magor is well advised to take a close look at Federal Rule of Civil Procedure 11 before filing further pleadings with this Court. Any such pleading should represent her work, reflect the specific facts of her case, and be supported, if necessary, by case law applicable to this Court.[3]

Finally, Magor's complaint contains several criminal charges, most notably criminal conspiracy. If Magor wishes to pursue these claims further, she should consult with the appropriate criminal prosecuting agency. The Court has not evaluated these charges and certainly does not endorse them; and Magor is advised that prosecutors have broad discretion in deciding which cases to pursue. *See United States v. Molina*, 530 F.3d 326, 332 (5th Cir. 2008) ("The government has great discretion in deciding whether, and which offenses, to prosecute."). In any event, the decision whether to prosecute a criminal charge does not lie with this Court. Thus, Magor is ordered to omit any criminal allegations in future pleadings.

Magor's current complaint is too long, it contains a great deal of information of little relevance and vice versa; and is mostly based on law from another Circuit. It also almost certainly does not represent her own investigation or work. It falls far short of the basic pleading standard under Federal Rule of Civil Procedure 8(a)(2), the heightened pleading standard for fraud under Rule 9(b), and the Supreme Court's decision in *Iqbal*. Magor's complaint needs to be entirely rewritten to comply with these requirements; minor revision will not suffice. Consequently, the Court

---

[3] Although it is needless to say, the Court likes a clean record, so it DENIES Magor's motion for sanctions against GMAC for failing "to speak with candor with the court." Pl. Rep. at 7. Magor is advised in the strongest possible terms that a similarly baseless motion in the future is likely to earn her the sanctions she seeks against her opponent.

Case 1:10-cv-03121-PA   Document 13-5   Filed 02/04/11   Page 31 of 31   Page ID#:
182
Case 1:10-cv-00481-SS   Document 14   Filed 10/06/10   Page 6 of 6

GRANTS GMAC's motion and orders Magor to amend her complaint within twenty (20) days, or it will be dismissed.

Magor is further ordered to organize any new pleading in a way that clearly identifies: (1) the specific factual allegations she is making, including, where appropriate, the time, place, and people involved; and (2) her causes of action, including a brief summary of the facts that support them and the relief sought. She is to omit unnecessary background information, polemics about the mortgage industry, and all other items identified above. Magor is finally—and seriously—cautioned that the Court will be inclined to impose sanctions against her if her new pleading does not represent a good faith effort to comply with the requirements of Federal Rule of Civil Procedure 11(b).

Accordingly,

IT IS ORDERED that Defendant's Motion to Dismiss Plaintiff's Complaint [#7] is GRANTED;

IT IS FURTHER ORDERED that Plaintiff has TWENTY (20) DAYS to amend her complaint or it will be dismissed;

IT IS FINALLY ORDERED that the parties' Proposed Scheduling Order [#13] is DENIED as moot in light of the Court's dismissal of Plaintiff's claims.

SIGNED this the _5__ day of October 2010.

SAM SPARKS
UNITED STATES DISTRICT JUDGE