# EXHIBIT F

1  Placido F. & Yolanda G. Soliven
2  502 Douglas Street
3  Chula Vista, CA 91910
4  619-656-8392
5

FILED

2010 JUN 29 PM 2: 13

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

6          UNITED STATES DISTRICT COURT
7          DISTRICT OF CALIFORNIA

Placido F. & Yolanda G. Soliven          Case # '10 CV 1 367 JLS JMA

Plaintiff,

        vs.                              ORIGINAL PETITION AND
                                         PETITION FOR RESTRAINING
Wells Fargo Home Mortgage                        ORDER

Defendant

8

9                              Date: _____

10  Comes now Placido F. & Yolanda G. Soliven, hereinafter referred to as
11  "Petitioner," and moves the court for relief as herein requested:

12                          **PARTIES**
13  Petitioner is Placido F. & Yolanda G. Soliven, 502 Douglas Street, Chula Vista, CA 91910.
14  Currently Known Defendant(s) are/is Wells Fargo Home Mortgage, 3476 Stateview Blvd., Fort
15  Mill, SC 29715

16                      **STATEMENT OF CAUSE**
17  Petitioner, entered into a consumer contract for the refinance of a primary residence located at
18  502 Douglas Street, Chula Vista, CA 91910 on July 11, 2007 DOC# 2007-0466022, hereinafter
19  referred to as the "property."

20  Defendants, acting in concert and collusion with others, induced Petitioner to enter into a
21  predatory loan agreement with Defendant.

22  Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully
23  crafted scheme intended to defraud Petitioner.

ORIGINAL PETITION          1 of 25

24   Defendants failed to make proper notices to Petitioner that would have given Petitioner warning
25   of the types of tactics used by Defendants to defraud Petitioner.

26   Defendants charged false fees to Petitioner at settlement.

27   Defendants used the above referenced false fees to compensate agents of Petitioner in order to
28   induce said agents to breach their fiduciary duty to Petitioner.

29   Defendant's attorney caused to be initiated collection procedures, knowing said collection
30   procedures in the instant action were frivolous as lender is estopped from collection procedures,
31   under authority of Uniform Commercial Code 3-501, subsequent to the request by Petitioner for
32   the production of the original promissory note alleged to create a debt.

33                                    **IN BRIEF**
34                        *(Non-factual Statement of Posture and Position)*

35   It is not the intent of Petitioner to indict the entire industry. It is just that Plaintiff will be
36   making a number of allegations that, outside the context of the current condition of the real
37   estate industry, may seem somewhat outrageous and counter-intuitive.

38   When Petitioner accuses ordinary individuals of acting in concert and collusion with an
39   ongoing criminal conspiracy, it tends to trigger an incredulous response as it is
40   unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary
41   people, just doing what they have been trained to do, are out to swindle the poor
42   unsuspecting borrower.

43   The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud
44   committed by people acting in concert and collusion, one with the other. Petitioner has no
45   reason to believe that the Agent, loan officer, appraiser, and others were consciously aware
46   that what they were doing was part of an ongoing criminal conspiracy, only that it was,
47   and they, at the very least, kept themselves negligently uninformed of the wrongs they
48   were perpetrating. Petitioner maintains the real culprit is the system itself, including the
49   courts, for failure to strictly enforce the consumer protection laws.

50                    **CAREFULLY CRAFTED CRIMINAL CONNIVANCE**
51                        *(General State of the Real Estate Industry)*

52    *THE BEST OF INTENTIONS*

53    Prior to the 1980's and 1990's ample government protections were in place to protect
54    consumers and the lending industry from precisely the disaster we now experience.
55    During President Clinton's administration, under the guise of making housing available to
56    the poor, primary protections were relaxed which had the effect of releasing the
57    unscrupulous on the unwary.

58    Prior to deregulation in the 1980's, lenders created loans for which they held and assumed
59    the risk.  Consequently, Americans were engaged in safe and stable home mortgages.
60    With the protections removed, the unscrupulous lenders swooped in and, instead of
61    making loans available to the poor, used the opportunity to convince the unsophisticated
62    American public to do something that had been traditionally taboo; home buyers were
63    convinced to speculate with their homes, their most important investment.

64    Wells Fargo Bank, NA , Ameriquest, Countrywide, and many others swooped in and
65    convinced Americans to sell their homes, get out of their safe mortgage agreements, and
66    speculate with the equity they had gained by purchasing homes they could not afford.
67    Lenders created loans intended to fail as, under the newly crafted system, the Lender
68    profited more from a mortgage default than from a stable loan.

69    Companies cropped up who called themselves banks when, in fact, they were only either
70    subsidiaries of banks, or unaffiliated companies that were operated for the purpose of
71    creating and selling promissory notes.  As will be demonstrated, these companies then
72    profited from the failure of the underlying loans.

73    *HOW IT WORKS*

74    Briefly, how it works is this, the Lender would secure a large loan from a large bank,
75    convert that loan into 20 and 30 year mortgages and then sell the promise to pay to an
76    investor.

77    People would set up mortgage companies buy securing a large loan from one of the major
78    banks, then convert that loan into 20 and 30 year mortgages.  In order to accomplish this
79    an Agent would contract with a seller to find a buyer, bring both seller and buyer to a
80    lender who would secure the title from the seller using the borrowed bank funds for that
81    purpose, and then trade the title to the buyer in exchange for a promissory note.

ORIGINAL PETITION            3 of 25

82  The lender then <u>creates</u> a 20 or 30 year mortgage with money the lender must repay within
83  6 months. As soon as the closing is consummated, the promissory note is sold to an
84  investor pool.

85  Using the instant case as an example, a 448,000.00 note at 7.1834%% interest over 30
86  years will produce $371,620.26   The lender can then offer <u>to the investor</u> the security
87  instrument (promissory note) at say 50% of it's future value. The investor will, over the
88  life of the note, less approximately 3.00% servicing fees, realize $535,585.94 . The lender
89  . can then pay back the bank and retain a handsome profit in the amount of $120,714.96.
90  The lender, however, is not done with the deal.

91  The lender signed over the promissory note to the investor at the time of the trade, <u>but</u> did
92  not sign over the lien document (mortgage or deed of trust). The State of Kansas Supreme
93  Court addressed this issue and stated that such a transaction was certainly legal. However,
94  it created a fatal flaw as the holder of the lien document, at time of sale of the security
95  instrument, received consideration in excess of the lien amount. Since the lien holder
96  received consideration, he could not be harmed.     Therefore the lien became an
97  unenforceable document.

98  This begs <u>the</u> question: if keeping the lien would render it void, why would the lender not
99  simply transfer the lien with the promissory note? The <u>reason is because the</u> lender will
100  hold the lien for three years, file an Internal Revenue Service Form 1099a, claim the full
101  amount of the lien as abandoned funds, and deduct the full amount from the lender's tax
102  liability. The lender, by this maneuver, gets consideration a second time. And still the
103  lender is not done profiting from the deal.

104  After sale of the promissory note, the lender remains as the servicer for the investor. The
105  lender will receive 3% of each payment the lender collects and renders to the investor
106  pool. However, if the payment is late, the lender is allowed to assess an extra 5% and keep
107  that amount. Also, if the loan defaults, the lender stands to gain thousands for handling the
108  foreclosure.

109  The lender stands to profit more from a note that is overly expensive, than from a good
110  stable loan. And where, you may ask, does all this profit come from? It comes from the
111  equity the borrower had built up in the home. And still the lender is not finished profiting
112  from the deal.

113 Another nail was driven in the American financial coffin when on the last day Congress
114 was in session in 2000 when restrictions that had been in place since the economic
115 collapse of 1907 were removed. Until 1907 investors were allowed to bet on stocks
116 without actually buying them. This unbridled speculation led directly to an economic
117 collapse. As a result the legislature banned the practice, until the year 2000. In 2000 the
118 unscrupulous lenders got their way on the last day of the congressional session. Congress
119 removed the restriction banning derivatives and again allowed the practice, this time
120 taking only 8 years to crash the stock market. This practice allowed the lender to profit
121 further from the loan by betting on the failure of the security instrument he had just sold to
122 the unwary investor, thus furthering the purpose of the lender to profit from both the
123 borrower (consumer) and the investor.

124 The failure of so many loans recently resulted in a seven hundred and fifty billion dollar
125 bailout at the expense of the taxpayer. The unsuspecting consumer was lulled into
126 accepting the pronouncements of the lenders, appraisers, underwriters, and trustees as all
127 were acting under the guise of government regulation and, therefore, the borrower had
128 reason to expect good and fair dealings from all. Unfortunately, the regulations in place to
129 protect the consumer from just this kind of abuse were simply being ignored.

130 The loan origination fee from the HUD1 settlement statement is the finder's fee paid for
131 the referral of the client to the lender by a person acting as an agent for the borrower.
132· Hereinafter, the person or entity who receives any portion of the yield spread premium, or
133 a commission of any kind consequent to securing the loan agreement through from the
134 borrower will be referred to as "Agent." The fee, authorized by the consumer protection
135 law is restricted to 1% of the principal of the note. It was intended that the Agent, when
136 seeking out a lender for the borrower, would seek the best deal for his client rather than
137 who would pay him the most. That was the intent, but not the reality. The reality is that
138 Agents never come away from the table with less than 2% or 3% of the principal. This is
139 accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his
140 fiduciary duty to the borrower and convince the borrower to accept a more expensive loan
141 product than the borrower qualifies for. This will generate more profits for the lender and,
142 consequently, for the Agent.

143 It is a common practice for lenders to coerce appraisers to give a higher appraisal than is
144 the fair market price. This allows the lender to increase the cost of the loan product and
145 give the impression that the borrower is justified in making the purchase.

ORIGINAL PETITION     5 of 25

146   The lender then charges the borrower an underwriting fee in order to convince the
147   borrower that someone with knowledge has gone over the conditions of the note and
148   certified that they meet all legal criteria. The trustee, at closing, participates actively in the
149   deception of the borrower by placing undue stress on the borrower to sign the large stack
150   of paperwork without reading it. The trustee is, after all, to be trusted and has been paid to
151   insure the transaction. This trust is systematically violated for the purpose of taking unfair
152   advantage of the borrower. The entire loan process is a carefully crafted contrive
153   connivance designed and intended to induce the unsophisticated borrower into accepting a
154   loan product that is beyond the borrowers means to repay. With all this, it should be a
155   surprise to no one that this country is having a real estate crisis.

156                           **PETITIONER WILL PROVE THE FOLLOWING**

157   Petitioner is prepared to prove, by a preponderance of evidence that:

158   • Lender has no legal standing to bring collection or foreclosure claims against the
159      property;

160   • Lender is not a real party in interest in any contract which can claim a collateral
161      interest in the property;

162   • even if Lender were to prove up a contract to which Lender had standing to enforce
163      against Petitioner, no valid lien exists which would give Lender a claim against the
164      property;

165   • even if Lender were to prove up a contract to which Lender had standing to enforce
166      against Petitioner, said contract was fraudulent in its creation as endorsement was
167      secured by acts of negligence, common law fraud, fraud by non-disclosure, fraud in
168      the inducement, fraud in the execution, usury, and breaches of contractual and
169      fiduciary obligations by Mortgagee or "Trustee" on the Deed of Trust, "Mortgage
170      Agents," "Loan Originators," "Loan Seller," "Mortgage Aggregator," "Trustee of
171      Pooled Assets," "Trustee or officers of Structured Investment Vehicle,"
172      "Investment Banker," "Trustee of Special Purpose Vehicle/Issuer of Certificates of
173      'Asset-Backed Certificates,'" "Seller of 'Asset-Backed' Certificates (shares or
174      bonds)," "Special Servicer" and Trustee, respectively, of certain mortgage loans
175      pooled together in a trust fund;

ORIGINAL PETITION              6 of 25

176    • Defendants have concocted a carefully crafted connivance wherein Lender
177       conspired with Agents, et al, to strip Petitioner of Petitioner's equity in the property
178       by inducing Plaintiff to enter into a predatory loan inflated loan product;

179    • Lender received unjust enrichment in the amount of 5% of each payment made late
180       to Lender while Lender and Lender's assigns acted as servicer of the note;

181    • Lender and Lender's assigns, who acted as servicer in place of Lender, profited by
182       handling the foreclosure process on a contract Lender designed to have a high
183       probability of default;

184    • Lender intended to defraud Investor by converting the promissory note into a
185       security instrument and selling same to Investor;

186    • Lender intended to defraud Investor and the taxpayers of the United States by
187       withholding the lien document from the sale of the promissory note in order that
188       Lender could then hold the lien for three years, then prepare and file Internal
189       Revenue Form 1099a and falsely claim the full lien amount as abandoned funds
190       and deduct same from Lender's income tax obligation;

191    • Lender defrauded backers of derivatives by betting on the failure of the promissory
192       note the lender designed to default;

193    • Participant Defendants, et al, in the securitization scheme described herein have
194       devised business plans to reap millions of dollars in profits at the expense of
195       Petitioner and others similarly situated.

196                              **PETITIONER SEEKS REMEDY**

197    In addition to seeking compensatory, consequential and other damages, Petitioner seeks
198    declaratory relief as to what (if any) party, entity or individual or group thereof is the
199    owner of the promissory note executed at the time of the loan closing, and whether the
200    Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory
201    Injunction requiring re-conveyance of the subject property to the Petitioner or, in the
202    alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

203    *PETITIONER HAS BEEN HARMED*

204    Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

205 Such harm and detriment includes economic and non-economic damages, and injuries to
206 Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

207 In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the
208 equitable relief requested herein is granted.

209                          **STATEMENT OF CLAIM**

210      *DEFENDANTS LACK STANDING*

211          **No evidence of Contractual Obligation**

212 Defendants claim a controversy based on a contractual violation by Petitioner but have failed to
213 produce said contract. Even if Defendants produced evidence of the existence of said contract in
214 the form of an allegedly accurate photocopy of said document, a copy is only hearsay evidence
215 that a contract actually existed at one point in time. A copy, considering the present state of
216 technology, could be easily altered. As Lender only created one original and that original was
217 left in the custody of Lender, it was imperative that Lender protect said instrument.

218 In as much as the Lender is required to present the original on demand of Petitioner, there can be
219 no presumption of regularity when the original is not so produced. In as much as Lender has
220 refused Petitioner's request of the chain of custody of the security instrument in question by
221 refusing to identify all current and past real parties in interest, there is no way to follow said
222 chain of custody to insure, by verified testimony, that no alterations to the original provisions in
223 the contract have been made. Therefore, the alleged copy of the original is only hearsay
224 evidence that an original document at one time existed. Petitioner maintains that, absent
225 production of admissible evidence of a contractual obligation on the part of Petitioner,
226 Defendants are without standing to invoke the subject matter jurisdiction of the court.

227          **No Proper Evidence of Agency**

228 Defendants claim agency to represent the principal in a contractual agreement involving
229 Petitioner, however, Defendants have failed to provide any evidence of said agency other than a
230 pronouncement that agency has been assigned by some person, the true identity and capacity of
231 whom has not been established. Defendants can hardly claim to be agents of a principal then
232 refuse to identify said principal. All claims of agency are made from the mouth of the agent with
233 no attempt to provide admissible evidence from the principal.

234 Absent proof of agency, Defendants lack standing to invoke the subject matter jurisdiction of the
235 court.

236      **Special Purpose Vehicle**

237 Since the entity now claiming agency to represent the holder of the security instrument is not the
238 original lender, Petitioner has reason to believe that the promissory note, upon consummation of
239 the contract, was converted to a security and sold into a special purpose vehicle and now resides
240 in a Real Estate Mortgage Investment Conduit (REMIC)    as defined by the Internal Revenue
241 Code and as such, cannot be removed from the REMIC as such would be a prohibited
242 transaction.    If the mortgage was part of a special purpose vehicle and was removed on
243 consideration of foreclosure, the real party in interest would necessarily be the trustee of the
244 special purpose vehicle. Nothing in the pleadings of Defendants indicates the existence of a
245 special purpose vehicle, and the lack of a proper chain of custody documentation gives Petitioner
246 cause to believe defendant is not the proper agent of the real party in interest.

247      *CRIMINAL CONSPIRACY AND THEFT*

248 Defendants, by and through Defendant's Agents, conspired with other Defendants, et al, toward
249 a criminal conspiracy to defraud Petitioner. Said conspiracy but are not limited to acts of
250 negligence, breach of fiduciary duty, common law fraud, fraud by non-disclosure, and tortuous
251 acts of conspiracy and theft, to include but not limited to, the assessment of improper fees to
252 Petitioner by Lender, which were then used to fund the improper payment of commission fees to
253 Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

254      *AGENT PRACTICED UP-SELLING*

255 By and through the above alleged conspiracy, Agent practiced up-selling to Petitioner. In so
256 doing, Agent violated the trust relationship actively cultivated by Agent and supported by fact
257 that Agent was licensed by the state. Agent further defrauded Petitioner by failing to disclose
258 Agent's conspiratorial relationship to Lender, Agent violated Agent's fiduciary duty to
259 Petitioner and the duty to provide fair and honest services, through a series of carefully crafted
260 connivances, wherein Agent proactively made knowingly false and misleading statements of
261 alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead
262 Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of
263 a loan product offered by the Lender. Said loan product was more expensive than Petitioner

Case 1:10-cv-03121-BA- Document 13-6 Filed 02/04/11 Page 11 of 31 Page ID#:
Case 3:10-cv-01367-JLS-JMA Document 1 Filed 06/29/10 Page 18 of 58
193

264 could legally afford. Agent acted with full knowledge that Petitioner would have made a
265 different decision had Agent given complete disclosure.

266     *FRAUDULENT INDUCEMENT*

267 Lender maliciously induced Petitioner to accept a loan product, Lender knew, or should have
268 known, Petitioner could not afford in order to unjustly enrich Lender.

269     *EXTRA PROFIT ON SALE OF PREDATORY LOAN PRODUCT*

270 Said more expensive loan product was calculated to produce a higher return when sold as a
271 security to an investor who was already waiting to purchase the loan as soon as it could be
272 consummated.

273     **Extra Commission for Late Payments**

274 Lender acted with deliberate malice in order to induce Petitioner to enter into a loan agreement
275 that Lender intended Petitioner would have difficulty paying. The industry standard payment to
276 the servicer for servicing a mortgage note is 3% of the amount collected. However, if the
277 borrower is late on payments, a 5% late fee is added and this fee is retained by the servicer.
278 Thereby, the Lender stands to receive more than double the regular commission on collections if
279 the borrower pays late.

280     **Extra Income for Handling Foreclosure**

281 Lender acted with deliberate malice in order to induce petitioner to enter into a loan agreement
282 on which Lender intended petitioner to default. In case of default, the Lender, acting as servicer,
283 receives considerable funds for handling and executing the foreclosure process.

284     **Credit Default Swap Gambling**

285 Lender, after deliberately creating a loan intended to default is now in a position to bet on credit
286 default swap, commonly referred to as a derivative as addressed more fully below. Since Lender
287 designed the loan to fail, betting on said failure is essentially a sure thing.

288     *LENDER ATTEMPTING TO FRAUDULENTLY COLLECT ON VOID LIEN*

289 Lender sold the security instrument after closing and received consideration in an amount in
290 excess of the lien held by Lender. Since Lender retained the lien document upon the sale of the
    ORIGINAL PETITION       10 of 25

291  security instrument, Lender separated the lien from said security instrument, creating a fatal and
292  irreparable flaw.

293  When Lender received consideration while still holding the lien and said consideration was in
294  excess of the amount of the lien, Lender was in a position such that he could not be harmed and
295  could not gain standing to enforce the lien. The lien was, thereby, rendered void.

296  Since the separation of the lien from the security instrument creates such a considerable concern,
297  said separation certainly begs a question: "Why would the Lender retain the lien when selling the
298  security instrument?"

299  When you follow the money the answer is clear. The Lender will hold the lien for three years,
300  then file an IRS Form 1099a and claim the full amount of the lien as abandoned funds and deduct
301  the full amount from Lender's tax liability, thereby, receiving consideration a second time.

302  Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the
303  lien to the holder of the security, however, the lien once satisfied, does not gain authority just
304  because the holder, after receiving consideration, decides to transfer it to someone else.

305  *LENDER PROFIT BY CREDIT DEFAULT SWAP DERIVATIVES*

306  Lender further stood to profit by credit default swaps in the derivatives market, by way of inside
307  information that Lender had as a result of creating the faulty loans sure to default. Lender was
308  then free to invest on the bet that said loan would default and stood to receive unjust enrichment
309  a third time. This credit default swap derivative market scheme is almost totally responsible for
310  the stock market disaster we now experience as it was responsible for the stock market crash in
311  1907.

312  *TRUTH IN LENDING STATEMENT VARIANCES*

313  The lender defrauded Petitioner by claiming a fraudulent payment amount not consistent with the
314  provisions of the contract entered into by Petitioner. If Petitioner paid the amount specified by
315  the Truth in Lending Statement, instead of the amount agreed to in the promissory note created
316  by Petitioner, Lender would have defrauded Petitioner of an amount equal to $358,771.38.

317 **LENDER CHARGED FALSE FEES**

318 Lender charged fees to Petitioner that were in violation of the limitations imposed by the Real
319 Estate Settlement Procedures Act as said fees were simply contrived and not paid to a third party
320 vendor.

321 Lender charged other fees that were a normal part of doing business and should have been
322 included in the finance charge.

323 Below is a listing of the fees charged at settlement. Neither at settlement, nor at any other time
324 did Lender or Trustee provide documentation to show that the fees herein listed were valid,
325 necessary, reasonable, and proper to charge Petitioner.

| | | |
|---|---|---|
| 803 | Appraisal Fee | $275.00 |
| 804 | Credit Report | $14.00 |
| 805 | Tax Service Fee | $65.00 |
| 806 | Flood Life of Loan Fee | $19.00 |
| 807 | Processing Fee | $650.00 |
| 808 | Title Ins. Fee | $1,000.00 |
| 809 | Loan Signing Fee | $100.00 |
| 901 | Interest from to @ /day ( days) | $1,610.91 |
| 903 | Hazard Insurance Premium | $812.40 |
| 1004 | County Property Taxes | $1,229.20 |
| 1101 | Settlement or closing fee to | $5,511.99 |
| 1201 | Recording Fee | $75.00 |

326 Debtor is unable to determine whether or not the above fees are valid in accordance with the
327 restrictions provided by the various consumer protection laws. Therefore, please provide; a
328 complete billing from each vendor who provided the above listed services; the complete contact
329 information for each vendor who provided a billed service; clearly stipulate as to the specific
330 service performed; a showing that said service was necessary; a showing that the cost of said
331 service is reasonable; a showing of why said service is not a regular cost of doing business that
332 should rightly be included in the finance charge.

333 The above charges are hereby disputed and deemed unreasonable until such time as said charges
334 have been demonstrated to be reasonable, necessary, and in accordance with the limitations and
335 restrictions included in any and all laws, rules, and regulations intended to protect the consumer.

336 In the event lender fails to properly document the above charges, borrower will consider same as
337 false charges. The effect of the above amounts that borrower would pay over the life of the note
338 will be an overpayment of $284,680.64  This amount will be reduced by the amount of items
339 above when said items are fully documented.

ORIGINAL PETITION          12 of 25

340    *RESPA PENALTY*

341    From a cursory examination of the records, with the few available, the apparent RESPA
342    violations are as follows: Good Faith Estimate not within limits, No HUD-1 Booklet, Truth In
343    Lending Statement not within limits compared to Note, Truth in Lending Statement not timely
344    presented, HUD-1 not presented at least one day before closing, No Holder Rule Notice in Note,
345    No 1st Payment Letter.

346    The closing documents included no signed and dated : Financial Privacy Act Disclosure; Equal
347    Credit Reporting Act Disclosure; notice of right to receive appraisal report; servicing disclosure
348    statement; borrower's Certification of Authorization; notice of credit score; RESPA servicing
349    disclosure letter; loan discount fee disclosure; business insurance company arrangement
350    disclosure; notice of right to rescind.

351    The courts have held that the borrower does not have to show harm to claim a violation of the
352    Real Estate Settlement Procedures Act, as the Act was intended to insure strict compliance. And,
353    in as much as the courts are directed to assess a penalty of no less than two hundred dollars and
354    no more than two thousand, considering the large number enumerated here, it is reasonable to
355    consider that the court will assess the maximum amount for each violation.

356    Since the courts have held that the penalty for a violation of RESPA accrues at consummation of
357    the note, borrower has calculated that, the number of violations found in a cursory examination
358    of the note, if deducted from the principal, would result in an overpayment on the part of the
359    borrower, over the life of the note, of $332,889.73.

360    If the violation penalty amounts for each of the unsupported fees listed above are included, the
361    amount by which the borrower would be defrauded is $375,256.49

362    Adding in RESPA penalties for all the unsupported settlement fees along with the TILA/Note
363    variance, it appears that lender intended to defraud borrower in the amount of $1,351,598.24

364    *LENDER CONSPIRED WITH APPRAISER*

365    Lender, in furtherance of the above referenced conspiracy, conspired with appraiser for the
366    purpose of preparing an appraisal with a falsely stated price, in violation of appraiser's fiduciary
367    duty to Petitioner and appraiser's duty to provide fair and honest services, for the purpose of
368    inducing Petitioner to enter into a loan product that was fraudulent toward the interests of
369    Petitioner.

ORIGINAL PETITION         13 of 25

370    **LENDER CONSPIRED WITH TRUSTEE**

371    Lender conspired with the trust Agent at closing to create a condition of stress for the specific
372    purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and
373    fully understand what was being signed.

374    The above referenced closing procedure was a carefully crafted connivance, designed and
375    intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty
376    to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner
377    did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure
378    as required by various consumer protection statutes.

379    **DECEPTIVE ADVERTISING AND OTHER UNFAIR BUSINESS PRACTICES**

380    In the manner in which Defendants have carried on their business enterprises, they have engaged
381    in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45* et seq.
382    (Deceptive Practices Act).

383    Such conduct comprises a pattern of business activity within the meaning of such statutes, and
384    has directly and proximately caused Petitioner to suffer economic and non-economic harm and
385    detriment in an amount to be shown according to proof at trial of this matter.

386    **EQUITABLE TOLLING FOR TILA AND RESPA**

387    The Limitations Period for Petitioners' Damages Claims under TILA and RESPA should be
388    Equitably Tolled due to the DEFENDANTS' Misrepresentations and Failure to Disclose.

389    Any claims for statutory and other money damages under the Truth in Lending Act *(15 U.S.C. §*
390    *1601*, et. seq.) and under the Real Estate Settlement Procedures Act *(12 U.S.C. § 2601* et. seq.)
391    are subject to a one-year limitations period; however, such claims are subject to the equitable
392    tolling doctrine. The Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as
393    subject to equitable tolling. In *King v. California, 784 F.2d 910 (9th Cir.1986),* the court held
394    that given the remedial purpose of TILA, the limitations period should run from the date of
395    consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate
396    circumstances, suspend the limitations period until the borrower discovers or has reasonable
397    opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King*
398    *v. California, 784 F.2d 910, 915 9*th Cir. 1986).

ORIGINAL PETITION          14 of 25

399    Likewise, while the Ninth Circuit has not taken up the question whether *12 U.S.C. § 2614,* the
400    anti-kickback provision of **RESPA,** is subject to equitable tolling, other Courts have, and hold
401    that such limitations period may be equitably tolled. The Court of Appeals for the District of
402    Columbia held that § 2614 imposes a strictly jurisdictional limitation, *Hardin v. City Title &*
403    *Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986),* while the Seventh Circuit came to the
404    opposite conclusion. *Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1164 (7th*
405    *Cir. 1997).* District courts have largely come down on the side of the Seventh Circuit in holding
406    that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v.*
407    *Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co.,*
408    *700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988).* Importantly, the Ninth Circuit, as noted above, has
409    interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the
410    language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914.* While not
411    of precedential value, this Court has previously found both the TILA and **RESPA** limitations
412    periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504*
413    *F.Supp.2d 1091,* (W.D. Wash. 2007). 1106-07.

414    The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay
415    by the Petitioner," and inquires whether "a reasonable Petitioner would ... have known of the
416    existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d*
417    *409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000).*
418    Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on
419    any wrongful conduct by the Defendants. Santa Maria. at 1178.

420    *BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING*
421    *STANDARDS*

422    Traditionally, Lenders required borrowers seeking mortgage loans to document their income and
423    assets by, for example, providing W-2 statements, tax returns, bank statements, documents
424    evidencing title, employment information, and other information and documentation that could
425    be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's
426    ability to repay a particular loan over both the short and long term. Defendants deviated from and
427    disregarded these standards, particularly with regard to its riskier and more profitable loan
428    products.

429    **Low-Documentation/No-Documentation Loans.**

ORIGINAL PETITION           15 of 25

430 Driven by its desire for market share and a perceived need to maintain competitiveness with the
431 likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no
432 documentation loan products, including the HARMs and HELOCs described hereinabove, and
433 began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to
434 the already eased underwriting standards to the point of disregarding such standards. This
435 quickened the loan origination process, allowing for the generation of more and more loans
436 which could then be resold and/or securitized in the secondary market.

437 Defendants marketed no-documentation/low-documentation loan programs that included
438 HARMs and HELOCs, among others, in which loans were given based on the borrower's "stated
439 income" or "stated assets" (SISA) neither of which were verified. Employment was verbally
440 confirmed, if at all, but not further investigated, and income, if it was even considered as a factor,
441 was to be roughly consistent with incomes in the types of jobs in which the borrower was
442 employed. When borrowers were requested to document their income, they were able to do so
443 through information that was less reliable than in a full-documentation loan.

444 For stated income loans, it became standard practice for loan processors, loan officers and
445 underwriters to rely on www.salary.com to see if a stated income was reasonable. Such stated
446 income loans, emphasizing loan origination from a profitability standpoint at the expense of
447 determining the ability of the borrower to repay the loan from an underwriting standpoint,
448 encouraged the overstating and/or fabrication of income.

449 **Easing of Underwriting Standards**

450 In order to produce more loans that could be resold in the secondary mortgage market,
451 Defendants also relaxed, and often disregarded, traditional underwriting standards used to
452 separate acceptable from unacceptable risk. Examples of such relaxed standards were reducing
453 the base FICO score needed for a SISA loan.

454 Other underwriting standards that Defendants relaxed included qualifying interest rates (the rate
455 used to determine whether borrowers can afford the loan), loan to value ratios (the amount of
456 loan(s) compared to the appraised/sale price of the property, whichever is lower), and debt-to-
457 income ratios (the amount of monthly income compared to monthly debt service payments and
458 other monthly payment obligations.

459    With respect to HARMS, Defendants underwrote loans without regard to the borrower's long-
460    term financial circumstances, approving the loan based on the initial fixed rate without taking
461    into account whether the borrower could afford the substantially higher payment that would
462    inevitably be required during the remaining term of the loan.

463    With respect to HELOCs, Defendants underwrote and approved such loans based only on the
464    borrower's ability to afford the interest-only payment during the initial draw period of the loan,
465    rather than on the borrower's ability to afford the subsequent, fully amortized principal and
466    interest payments.

467    As Defendants pushed to expand market share, they eased other basic underwriting standards.
468    For example, higher loan-to-value (LTV) and combined loan-to-value (CLTV) ratios were
469    allowed. Likewise, higher debt-to-income (DTI) ratios were allowed. At the same time that they
470    eased underwriting standards the Defendants also were encouraging consumers to go further into
471    debt in order to supply the very lucrative aftermarket of mortgage backed securities. The relaxed
472    underwriting standards created the aftermarket supply they needed. As a result, the Defendants
473    made it easy for the unwary consumer to take on more debt than he could afford by encouraging
474    unsound financial practices, all the while knowing defaults would occur more and more
475    frequently as the credit ratios of citizens reached the limit of the new relaxed underwriting
476    standards.

477    Defendants knew, or in the exercise of reasonable care should have known, from its own
478    underwriting guidelines industry standards that it was accumulating and selling/reselling risky
479    loans that were likely to end up in default. However, as the pressure mounted to increase market
480    share and originate more loans, Defendants began to grant "exceptions" even to its relaxed
481    underwriting guidelines. Such was the environment that loan officers and underwriters were,
482    from time to time, placed in the position of having to justify why they did not approve a loan that
483    failed to meet underwriting criteria.

484    **Risk Layering**

485    Defendants compromised its underwriting even further by risk layering, i.e. combining high risk
486    loans with one or more relaxed underwriting standards.

487    Defendants knew, or in the exercise of reasonable care should have known, that layered risk
488    would increase the likelihood of default. Among the risk layering Defendants engaged in were

489 approving HARM loans with little to no down payment, little to no documentation, and high
490 DTI/LTV/CLTV ratios. Despite such knowledge, Defendants combined these very risk factors in
491 the loans it promoted to borrowers.

492 Loan officers and mortgage Agents aided and abetted this scheme by working closely with other
493 mortgage Lenders/mortgage bankers to increase loan originations, knowing or having reason to
494 believe that Defendants and other mortgage Lenders/mortgage bankers with whom they did
495 business ignored basic established underwriting standards and acted to mislead the borrower, all
496 to the detriment of the borrower and the consumer of loan products..

497 Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them,
498 engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the
499 business practices described above in paragraphs 30-42 of this Complaint

500 **_UNJUST ENRICHMENT_**

501 Petitioner is informed and believes that each and all of the Defendants received a benefit at
502 Petitioner's expense, including but not limited to the following: To the Agent, commissions,
503 yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to
504 be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums,
505 surcharges and other "back end" payments in amounts to be proved at trial; To the investors,
506 resale premiums, and high rates of return; To the servicers including EMS, servicing fees,
507 percentages of payment proceeds, charges, and other "back end" payments in amounts to be
508 proved at trial; To all participants, the expectation of future revenues from charges, penalties and
509 fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

510 By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants,
511 and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly
512 deprived, and is entitled to restitution in the amount of $1,351,598.24

513 **_CLAIM TO QUIET TITLE._**

514 Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and
515 the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title
516 interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission
517 and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

ORIGINAL PETITION   18 of 25

518  Defendants have no title, estate, lien, or interest in the Subject Property in that the purported
519  power of sale contained in the Deed of Trust is of no force or effect because Defendants' security
520  interest in the Subject Property has been rendered void and that the Defendants are not the holder
521  in due course of the Promissory Note. Moreover, because Petitioner properly pled all Defendants'
522  involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-conspirators,

523      "a Petitioner is entitled to damages from those Defendants who concur in the tortuous
524      scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co., 24 Cal.*
525      *3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, Inc.*
526      *v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d*
527      *27 (1st Dist. 2006); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal.*
528      *Rptr. 2d 752 (2d Dist. 1995).*

529  *SUFFICIENCY OF PLEADING*

530  Petitioner has sufficiently pled that relief can be granted on each and every one of the
531  Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond
532  doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would
533  entitle Petitioner to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All
534  allegations of material fact in the complaint are taken as true and construed in the light most
535  favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

536  Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc.
537  8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal
538  theories, and seeks remedies to which Petitioner is entitled. *Balistreri v. Pacifica Police Dept., 901 F.2d*
539  *696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal
540  conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court
541  should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752* (9th Cir, 1994). Lastly,
542  Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of
543  their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore,
544  relief as requested herein should be granted.

545 **CAUSES OF ACTION**

546 *BREACH OF FIDUCIARY DUTY*

547 Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary
548 duty of care with respect to the mortgage loan transactions and related title activities involving
549 the Trust Property.

550 Defendants breached their duties to Petitioner by, *inter alia,* the conduct described above. Such
551 breaches included, but were not limited to, ensuring their own and Petitioners' compliance with
552 all applicable laws governing the loan transactions in which they were involved, including but
553 not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

554 Defendant's breaches of said duties were a direct and proximate cause of economic and non-
555 economic harm and detriment to Petitioner(s).

556 Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct,
557 all to be shown according to proof at trial of this matter.

558 *CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE*

559 Defendants owed a general duty of care with respect to Petitioners, particularly concerning their
560 duty to properly perform due diligence as to the loans and related transactional issues described
561 hereinabove.

562 In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations
563 X and Z promulgated there under to, among other things, provide proper disclosures concerning
564 the terms and conditions of the loans they marketed, to refrain from marketing loans they knew
565 or should have known that borrowers could not afford or maintain, and to avoid paying undue
566 compensation such as "yield spread premiums" to mortgage Agents and loan officers.

567 Defendants knew or in the exercise of reasonable care should have known, that the loan
568 transactions involving Petitioner and other persons similarly situated were defective, unlawful,
569 violative of federal and state laws and regulations, and would subject Petitioner to economic and
570 non-economic harm and other detriment.

571 Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and
572 Z promulgated there under were intended and designed to protect, and the conduct alleged

ORIGINAL PETITION          20 of 25

573 against Defendants is the type of conduct and harm which the referenced statutes and regulations
574 were designed to deter.

575 As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and
576 non-economic harm in an amount to be shown according to proof at trial.

577 *AGENT: COMMON LAW FRAUD*

578 If any Agents' misrepresentations made herein were not intentional, said misrepresentations were
579 negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable
580 ground for believing them to be true.

581 Agents made these representations with the intention of inducing Petitioner to act in reliance on
582 these representations in the manner hereafter alleged, or with the expectation that Petitioner
583 would so act.

584 Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents
585 in their negligent misrepresentation, and that various Agents were negligent in not implementing
586 procedures such as underwriting standards oversight that would have prevented various Agents
587 from facilitating the irresponsible and wrongful misrepresentations of various Agents to
588 Defendants.

589 Petitioner is informed and believes that Agent acted in concert and collusion with others named
590 herein in promulgating false representations to cause Petitioner to enter into the LOAN without
591 knowledge or understanding of the terms thereof.

592 As a proximate result of the negligent misrepresentations of Agents as herein alleged, the
593 Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of
594 opportunities, attorney fees and costs, and other damages to be determined at trial. As a
595 proximate result of Agents' breach of duty and all other actions as alleged herein, Defendants has
596 suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and
597 mental and physical pain and anguish, all to Petitioner's damage in an amount to be established
598 at trial.

Case 1:10-cv-03121-RA Document 13-6 Filed 02/04/11 Page 23 of 31
Case 3:10-cv-01367-JLS-JMA Document 1 Filed 06/29/109 Page 22 of 58 Page ID#:
205

599      **PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED**
600      **COVENANT OF GOOD FAITH AND FAIR DEALING.**

601      Petitioner properly pled Defendants violated the breach of implied covenant of good faith and
602      fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its
603      performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261*
604      *Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v.*
605      *Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v*
606      *Jones, (2004) 33 Cal. 4th 917,* the court stated:

607      In the area of insurance contracts the covenant of good faith and fair dealing has taken on a
608      particular significance, in part because of the special relationship between the insurer and the
609      insured. The insurer, when determining whether to settle a claim, must give at least as much
610      consideration to the welfare of its insured as it gives to its own interests. . . The standard is
611      premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

612      Likewise, there is a special relationship between an Agent and borrower. "A person who
613      provides Agency services to a borrower in a covered loan transaction by soliciting Lenders or
614      otherwise negotiating a consumer loan secured by real property, is the fiduciary of the
615      consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the Agent may
616      be acting as an Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in
617      *good faith. If the Agent knew or should have known that the Borrower will or has a likelihood of*
618      *defaulting ... they have a fiduciary duty to the borrower not* to place them in that loan."
619      (California Department of Real Estate, *Section 8: Fiduciary Responsibility,* www.dre.ca.gov).
620      *[Emphasis Added].*

621      All Defendants, willfully breached their implied covenant of good faith and fair dealing with
622      Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to
623      provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan
624      product without regard for other more affordable products; (4) Placed Petitioner into a loan
625      without following proper underwriting standards; (5) Failed to disclose to Petitioner that
626      Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform
627      valid and /or properly documented substitutions and assignments so that Petitioner could
628      ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's
629      request for documentation of the servicing of Petitioner's loan and the existence and content of

ORIGINAL PETITION          22 of 25

Case 1:10-cv-01321-RA- Document 13-6 Filed 02/04/11 Page 24 of 31 Page ID#:
Case 3:10-cv-01367-JLS-JMA Document 1 Filed 06/29/10 Page 23 of 58
206

630 relevant documents. Additionally, Defendants breached their implied covenant of good faith and
631 fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the
632 right under an alleged power of sale because the purported assignment was not recorded and by
633 willfully and knowingly financially profiting from their malfeasance. Therefore, due to the
634 special relationship inherent in a real estate transaction between Agent and borrower, *and* all
635 Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

636     *CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET*
637     *SEQ*

638 Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation
639 contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of
640 Action as though the same were set forth herein.

641 Petitioner is informed and believes that Defendant's violation of the provisions of law rendered
642 the credit transaction null and void, invalidates Defendant's claimed interest in the Subject
643 Property, and entitles Petitioner to damages as proven at trial.

644     *INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

645 The conduct committed by Defendants, driven as it was by profit at the expense of increasingly
646 highly leveraged and vulnerable consumers who placed their faith and trust in the superior
647 knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by
648 civilized society.

649 Defendants either knew that their conduct would cause Petitioner to suffer severe emotional
650 distress, or acted in conscious and/or reckless disregard of the probability that such distress
651 would occur.

652 Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the
653 conduct of Defendants as described hereinabove.

654 As a result of such severe emotional distress, Petitioner suffered economic and non economic
655 harm and detriment, all to be shown according to proof at trial of this matter.

656 Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by
657 Petitioner and secure to Petitioner quite title;

ORIGINAL PETITION        23 of 25

Case 1:10-cv-03121-PA- Document 13-6 Filed 02/04/11 Page 25 of 31 Page ID#:
Case 3:10-cv-01367-JLS-JMA Document 1 Filed 06/29/10 Page 24 of 58
207

658  Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner

659  as payments to Defendants based on the fraudulently secured promissory note in an amount to be

660  calculated by Defendants and verified to Petitioner;

661  Petitioner further demands that Defendants pay to Petitioner an amount equal to treble the

662  amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be

663  equal to $4,054,794.72

664  **PRAYER**

665  WHEREFORE, Petitioner prays for judgment against the named Defendants, and each of them,

666  as follows:

667  For an emergency restraining order enjoining lender and any successor in interest from

668  foreclosing on Petitioner's Property pending adjudication of Petitioner's claims set forth

669  herein;

670  For a permanent injunction enjoining Defendants from engaging in the fraudulent,

671  deceptive, predatory and negligent acts and practices alleged herein;

672  For quiet title to Property;

673  For rescission of the loan contract and restitution by Defendants to Petitioner according

674  to proof at trial;

675  For disgorgement of all amounts wrongfully acquired by Defendants according to proof

676  at trial;

677  For actual monetary damages in the amount $1,351,598.24;

678  For pain and suffering due to extreme mental anguish in an amount to be determined at

679  trial.

680  For pre-judgment and post-judgment interest according to proof at trial;

681  For punitive damages according to proof at trial in an amount equal to $4,054,794.72.

682  For attorney's fees and costs as provided by statute; and,

683  For such other relief as the Court deems just and proper.

684  **Respectfully Submitted,**
685
686
687  Placido F. & Yolanda G. Soliven

ORIGINAL PETITION                    24 of 25

# VERIFICATION

We, Placido F. & Yolanda G. Soliven, do swear and affirm that all statements made herein are
true and accurate, in all respects, to the best of my knowledge.

Placido F. & Yolanda G. Soliven
502 Douglas Street
Chula Vista, CA 91910

SWORN TO AND SUBSCRIBED BEFORE ME, *Brooke Sheehan* Notary Public , by *Placido F. & Yolanda G.
Soliven* , on the _28th_ day of _June_____ , 2010, which witnesses my hand and seal of office.


_Brooke Sheehan_

**NOTARY PUBLIC IN AND FOR**

**THE STATE OF CALIFORNIA**


Notary Stamp

Case 1:10-cv-03121-PA7- Document 13-6 Filed 02/04/11 Page 27 of 31 Page ID#:
Case 3:10-cv-01367-JLS-JMA Document 1 Filed 06/29/10 Page 28 of 58
209

# Jurat

State of California

County of _San Diego_

Subscribed and sworn to (or affirmed) before me on this _28th_ day of _June_ ,

20 _10_ by _Placido F. & Yolanda G. Soliven_ ,

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

_Brook Sheehan_
Signature

(Notary seal)

> BROOK SHEEHAN
> Commission # 1719168
> Notary Public - California
> San Diego County
> My Comm. Expires Jan 21, 2011

# OPTIONAL INFORMATION

### INSTRUCTIONS FOR COMPLETING THIS FORM

*The wording of all Jurats completed in California after January 1, 2008 must be in the form as set forth within this Jurat. There are no exceptions. If a Jurat to be completed does not follow this form, the notary must correct the verbiage by using a jurat stamp containing the correct wording or attaching a separate jurat form such as this one which does contain proper wording. In addition, the notary must require an oath or affirmation from the document signer regarding the truthfulness of the contents of the document. The document must be signed AFTER the oath or affirmation. If the document was previously signed, it must be re-signed in front of the notary public during the jurat process.*

DESCRIPTION OF THE ATTACHED DOCUMENT

_Verification_
(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages _____ Document Date _____

_____
(Additional information)

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the jurat process is completed.
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Signature of the notary public must match the signature on file with the office of the county clerk.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different jurat form.
    ❖ Additional information is not required but could help to ensure this jurat is not misused or attached to a different document.
    ❖ Indicate title or type of attached document, number of pages and date.
- Securely attach this document to the signed document

2008 Version CAPA v1.9.07 800-873-9865 www.NotaryClasses.com

WestlawNext™

**Soliven v. Wells Fargo Home Mortg.**    2010 WL 4117409
United States District Court, S.D. California.    October 18, 2010    Slip Copy
Only the Westlaw citation is currently available.

Return to list    **2 of 21 results**    Search term

## This decision was reviewed by West editorial staff and not assigned editorial enhancements.

United States District Court,
S.D. California.

## Placido F. **SOLIVEN** and Yolanda G. **Soliven**, Plaintiffs,

### v.

## **WELLS FARGO** HOME MORTGAGE, Defendant.

No. 10CV1367 JLS (JMA).    Oct. 18, 2010.

### Attorneys and Law Firms

Placido F. **Soliven**, Chula Vista, CA, pro se.

Yolanda G. **Soliven**, Chula Vista, CA, pro se.

Erik Sean Bliss, Sheppard Mullin Richter & Hampton, San Diego, CA, for Defendant.

### Opinion

#### ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

JANIS L. SAMMARTINO, District Judge.

*\*1* Presently before the Court is Defendant **Wells Fargo** Home Mortgage's (Defendant or **Wells Fargo**) motion to dismiss plaintiffs' complaint. (Doc. No. 11 (Mot. to Dismiss).) Also before the Court is Plaintiffs Placido F. **Soliven** and Yolanda G. **Soliven's** (Plaintiffs) response in opposition (Doc. No. 12 (Opp'n)) and Defendant's reply in support. (Doc. No. 13 (Reply).) For the reasons stated below, the Court **GRANTS** Defendant's motion to dismiss:

#### BACKGROUND

Plaintiffs refinanced their home on July 11, 2007, taking out a loan for $448,000. (Doc. No. 6(FAC) at 1, 4.) The loan is now in dispute. Plaintiffs, proceeding pro se, filed its first complaint on June 29, 2010. Plaintiffs then filed an amended complaint on July 6, 2010. It alleges causes of action for (1) unjust enrichment, (2) quiet title, (3) breach of fiduciary duty, (4) negligence, (5) fraud, (6) breach of the implied covenant of good faith and fair dealing, (7) violation of Truth In Lending Act, 15 U.S.C. § 1601, and (8) intentional infliction of emotional distress.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits a party to raise by motion the defense that the complaint "fail[s] to state a claim upon which relief can be granted," generally referred to as a motion to dismiss. The Court evaluates whether a complaint states a cognizable legal theory and sufficient facts in light of Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Although Rule 8 "does not require 'detailed factual allegations,' ... it [does] demand[ ] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In other words, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 557).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly,* 550 U.S. at 570); *see also* Fed.R.Civ.P. 12(b) (6). A claim is facially plausible when the facts pled "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 556). That is not to say that the claim must be probable, but there must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Facts " 'merely consistent with' a defendant's liability" fall short of a plausible entitlement to relief. *Id.* (quoting *Twombly,* 550 U.S. at 557). Further, the Court need not accept as true "legal conclusions" contained in the complaint. *Id.* This review requires context-specific analysis involving the Court's "judicial experience and common sense." *Id.* at 1950 (citation omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.' " *Id.*

## ANALYSIS

**\*2** Plaintiff's complaint is devoid of any specific factual allegations. This is understandable because the first half of Plaintiff's complaint replicates a complaint available on the internet.[1] (Reply, Exhibit A at 1.) And the complaint on the internet is itself based on an internet essay concerning "what banks do and how they operate." (Reply, Exhibit B.) The second half of Plaintiff's complaint continues in much the same manner. As a whole, the complaint contains only conclusory statements and generalized facts. For instance, Plaintiff alleges that "Lender Conspired with Trustee" in the following manner:

> Lender conspired with the trust Agent at closing to create a condition of stress for the specific purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and fully understand what was being signed.

> The above referenced closing procedure was a carefully crafted connivance, designed and intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure as required by various consumer protection statutes.

(Complaint at 14.)

Plaintiff alleges "Deceptive Advertising and Other Unfair Business Practices" in a similar fashion:

> In the manner in which Defendants have carried out their business enterprises, they have engaged in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45* et seq. (Deceptive Practices Act).

> Such conduct comprises a pattern of business activity within the meaning of such statutes, and has directly and proximately caused Petitioner to suffer economic and non-economic harm and detriment in an amount to be shown according to proof at trial of this matter.

(*Id.*)

The only facts that are specifically alleged are Plaintiffs' names, Defendant's identity, location of the property, and the amount of the loan. A complaint so broadly stated that it contains no information specific to a party is not a complaint that satisfies Rule 8. This complaint could not even be considered an unadorned the-defendant-unlawfully-harmed-me accusation. *See Ashcroft,* 129 S.Ct. at 1949 (2009). And

when fraud is a cause of action, such a complaint certainly does not meet Rule 9's heightened pleading requirement. Plaintiffs' complaint fails to meet the pleading standards set forth in the Federal Rules of Civil Procedure. As a result, Plaintiffs fail to state a claim upon which relief can be granted.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendant's motion to dismiss. Plaintiffs' first amended complaint is **DISMISSED WITHOUT PREJUDICE.**

**IT IS SO ORDERED.**

### Footnotes

1   Interestingly enough, Plaintiff's opposition to the motion to dismiss states that "Defendant complains that the document is similar to other documents alleging wrongdoing by banks and lending institutions." (Opp'n ¶ 25.) The Court cannot find any such statement by Defendant in its motion to dismiss.